# EX PARTE H. G. WHITE

No. A-4941. Decided January 19, 1955.
(274 S.W. 2d Series 542)

*James H. Martin,* of Dallas, for relator.

The inability of an alleged contemner, without fault on his part, to render obedience to an order or decree of Court is a good defense to a charge of contempt for the disobedience of an order or decree. Allen v. Woodward, 239 S.W. 602; Ex parte Helms, 152 Texas 480, 259 S.W. 2d 184.

*Burt Barr* and *J. Lee Zumwalt,* of Dallas, for National Bond and Investment Company.

Mr. Justice Garwood delivered the opinion of the Court.

■ ■ In this original *habeas corpus* proceeding we granted the writ and released the relator, H. G. White, on bail from the custody of the sheriff of Dallas County in view of doubts as to whether his commitment for constructive contempt of the District Court of that county was sustained by any evidence. While relief in original proceedings requires that the adjudication of contempt be one that is void, rather than merely erroneous on the law or the facts, we yet review the proof adduced at the hearing and, if it shows as a matter of law (i.e. conclusively established) that the contempt charge is not sustained, we treat the adjudication as void. Ex parte Helms, 152 Texas 480, 259 S.W. 2d 184.

The alleged contempt consisted of the failure of relator to turn over to Charlie Davis, Receiver, upon demand of the latter, a Chevrolet automobile, motor number JAM272917, of which the receiver had been appointed to take possession by order of the abovementioned court dated March 29th, 1954, in a debt and foreclosure suit against relator by National Bond & Investment Company, as assignee of relator's purchase money note and mortgage of November 18, 1952, running in favor of a concern called R. & S. Motors, assignor of the foreclosure plaintiff and seller of the car to relator.

The original demand of the receiver and failure of the relator to deliver occurred at some date between that of the receivership order abovementioned and the motion for commitment of April 9th following. The original contempt order, providing for a fine and for imprisonment until the automobile should be surrendered, was made on May 7th, 1954, but expressly suspended actual commitment for sixty days. Thereafter, in September, 1954, relator was taken into custody, and, following a further hearing, the commitment was by order of September 22nd suspended for an additional thirty days. On October 29th, 1954, following a third hearing, relator was actually imprisoned until issuance of our writ. Since the three hearings were in effect but one continuous proceeding, we find it proper to treat them as one, the statement of facts reflecting the evidence as developed in all of them.

The relator admittedly executed the note and mortgage in question, including his warranty of ownership and right to mortgage the automobile, and contemporaneously (November 19th, 1952) made a sworn application for a title certificate stat-

ing that he was the owner by purchase from R. & S. Motors, receiving under date of December 5th, 1952, thereafter, the corresponding certificate from the State Highway Department, which is still subsisting in his name and unchanged. Relator himself asserts, moreover, that he has never sought to transfer or dispose of the title or possession of any such automobile at any time. Indeed, the proof discloses that, after November 19th, installment payments were made to National Bond & Investment Co. on relator's purchase money note and mortgage, although it does not appear that relator himself made them.

But the relator further testifies, and from the very first, that the abovementioned sale, registration and mortgage were fictitious and fraudulent on his part in that he has never received, seen, or intended to buy, any automobile, but made his signature and oath as abovementioned by way of an urgently requested personal favor to his uncle, one Noland (N.E.) Stanley, who was the owner and manager of R. & S. Motors (relator's abovementioned predecessor in title, seller and mortgagee). Relator swears that Stanley told him he was really selling the car to some third party (who presumably would pay relator's note and eventually get a title from relator). And although R. & S. Motors (Stanley) undoubtedly assigned relator's note and mortgage forthwith to National Bond & Investment Co. for value, the evidence discloses that the latter never saw the automobile. Stanley was not called as a witness, but relator swore without contradiction that he was in the Dallas County jail and, on grounds of self-incrimination, had declined to testify.

The following peculiar facts further appear without dispute:

The records of the State Highway Department reflect an unbroken chain of title of an automobile, as described in relator's note, mortgage and title certificate, from Winders Chevrolet Co., of Columbus, Ohio, to Alexander Rent A Car, Inc., of the same city (May 16th, 1951) to R. & S. Motors (November 19th, 1952) to relator (November 19th, 1952). Part of these documents originated, of course, in Ohio, where the registration laws are evidently similar to our own. The Texas Title number assigned to the car by the State Highway Department was 11226857. As stated, relator, the record holder of this title, disclaims having ever seen or had control of the corresponding automobile.

On the other hand there actually exists—in the name of a

Mr. W. G. Skagerty of Mineral Wells and in possession of his son, Eddie, at Brownwood—an automobile of virtually the same description, including the same motor number JAM272917, as that in the abovementioned documents executed or held by the relator. The Highway Department records reflect a title for such an automobile in Mr. Swagerty under the Title Number 13043888, a later number than the 11226857 corresponding to relator's "title." The former, however, is sort of substitute title for an earlier one, No. 10296218, which is earlier than relator's *and* referred to an altogether different motor number, JAM-80745. The Highway Department record history of this curious title shows transfers from Paul Davies Chevrolet, Inc., of Columbus, Ohio, to Alexander Rent A Car, Inc., to R. & S. Motors. The indicated original seller is different from the one in relator's title, but the Alexander concern is the same as that appearing in the corresponding position in relator's title. The indicated date of transfer to Alexander is January 31st, 1951 (as against May 16th, 1951 in the relator's title) and that to R. & S. Motors is April 9th, 1952 (as against November 19th, 1952 in the relator's title). The indicated motor number (at this stage of the chain) is JAM80745 (as against relator's JAM272917).

From R. & S. Motors the Swagerty chain goes on (still with motor number JAM80745) to Manning Motor Co., of Gatesville, Texas, on April 10th, 1952 (as against the corresponding transfer in relator's title—from R. & S. Motors to relator—on November 19th, 1952) ; to Leon Heath of Gatesville on April 10th, 1952; to Frank Meyers Motor Co. of Mineral Wells on May 25th, 1953; to W. G. Swagerty on June 25th, 1953.

On July 16th, 1953, F. C. Meyers, as owner of Swagerty's seller, Frank Meyers Motor Co., makes sworn application for correction of the preceding title (up until then Title Number 10296218, motor number JAM80745) stating that, from his personal inspection, the stated motor number is incorrect and should be JAM272917 (the number appearing in relator's Title Number 11226857). This application of July 16th, 1953 (some seven months after relator's purported and registered purchase of November 19th, 1952) was evidently refused, but a subsequent (December, 1953) application of Meyers' purchaser, Swagerty, was granted under date of February 5th, 1954, and a title certificate then issued to Swagerty changing the motor number from JAM80745 to JAM272917 and the title number from 10296218 to 13043888. No explanation appears as to why the Highway Department issued Title 13043888, without taking

some action about relator's conflicting Title 11226857, which was then outstanding since November 19th, 1952.

In this connection, on January 25th, 1954, F. C. Meyers, for Meyers Motor Co., executed a sworn bill of sale on a Highway Department form, transferring to Leon Heath abovementioned (who presumably did not own the automobile at that time, having sold it to Meyers over six months previously, stating the motor number to be JAM80745) a *motor,* being number JAM272917, which *motor* Meyers stated had been acquired by his concern on December 20th previously (1953) from Turner-Wagley Motor Sales of Mineral Wells. The result of this purported sale of the *motor* JAM272917 from Meyers to Heath would be, according to the records, that on January 25th, 1954, the *automobile,* with a motor numbered JAM80745, was in Swagerty, while Heath, on the same date, had but a *motor,* numbered JAM272917. However, while Meyers did not testify, it indisputably appears that thereafter, in the latter part of September, 1954, during the period of the contempt hearings, the automobile in the possession of Swagerty was inspected, and its motor number found to be JAM272917. It was also testified to, without contradiction and under waiver of possible objection for hearsay, that Meyers had admitted that he never purchased any motor numbered JAM272917 from Turner-Wagley Motor Sales and that his affidavit of January 25th, 1954, asserting said purchase, was false.

There also appears in the record an affidavit of Meyers, dated September 18th, 1954, asserting that he had never purchased any automobile or motor from relator. There is no statement from Meyers or anyone else as to who, if onyone, did sell the motor (JAM272917) to him, assuming his purchase from Turner-Wagley to have been, indeed, fictitious.

The development of this confusing and somewhat unsavory title picture in the evidence is evidently due to the effort to corroborate relator's testimony that his own acts and affidavit indicating his ownership of a car in November 1952 were false. Such corroboration as existed otherwise was the testimony of relator's wife that she had never seen or heard of the automobile and the abovementioned testimony of the representatives of National Bond & Investment Co., that they, too, had never seen it.

Under all the circumstances, the judge can scarcely be criticized for believing that relator's 1952 affidavit was true

and his testimony on the hearings false, or even for suspecting, if he did, that relator, having actually bought what he purported to buy in 1952, thereafter sold it, or the engine numbered JAM272917 from it, to Meyers, who in turn sold the automobile, or an automobile with relator's engine JAM272917, to Swagerty and got the Highway Department to issue the new title, despite relator's outstanding title.

■  But the point is not whether relator, under every theory of facts, is guilty of dishonesty, or whether he actually did own and control the property in question by virtue of his purported purchase in November, 1952, or whether he at some time thereafter somehow disposed of it to Meyers or someone else in the Swagetry chain of title. The point is whether he has contemptuosly disobeyed a court order or orders of March-April, 1954. Obviously such contempt is not to be presumed, but, subject to the proof, is presumed not to be. No doubt, proof of relator's purported purchase and registration, plus proof of his failure to make delivery to the receiver in 1954, would sustain the commitment, if such proof and the relator's testimony of a fictitious transaction were all the evidence. A court might not unreasonably assume that, relator's testimony being false, he still had control of the automobile in 1954. But we know for certain that the car, or at least the engine, was in the possession (and name) of Swagerty in September, 1954. And this undoubted fact, plus the documents of the Swagerty title, make it morally certain that it was also in possession and control of Meyers (Swagerty's immediate predecessor in the Swagerty title) and therefore out of the possession and control of relator, since sometime in 1953, or long before the receivership procedings. The possession and title of Swagerty at and after the time of the receivership cannot be inferred to be for the use and benefit of relator rather than Swagerty himself. And if relator did in fact sell the property to Meyers or Swagerty, such sale would not constitute contempt unless the sale was made after the receivership proceeding was begun in 1954. Contrary to the assertion of counsel for the respondent sheriff, neither Ex parte De Wees, 146 Texas 564, 210 S.W. 2d 145, nor Ex parte Klugsberg, 126 Texas 225, 87 S.W. 2d 465, purport to say otherwise. The pertinent observation in the former and the holding in the latter refer only to a situation where the contempt defendant has sought to defeat an existing court order by disabling himself from performing it. Such an act is itself contemptuous, as both decisions clearly state. But it is something quite different to say that where a party disposes of property in 1953 for some fraudulent purpose, when no receivership is pending, and in 1954 is first ordered

by a court to deliver it to a receiver, his 1953 act or his consequent 1954 failure to deliver are subject to punishment for contempt. That is not the law. Nor, when all the evidence is considered, is there much more than a suspicion that relator ever attempted a transfer or delivery of a car such as he purported to buy. There is no direct proof — oral, written or recorded — that he did. All the title papers indicate that he did not. The Meyers affidavit denies that relator transferred to Meyers.

Our conclusion, therefore, is that there is no evidence to sustain relator's commitment for contempt. The relator is accordingly discharged from custody, and the sureties on his bail bonds incident to this proceeding and the contempt proceeding are released.

Opinion delivered January 19, 1955.