# W. N. Deramus, III v. Honorable W. L. (Jack) Thornton, et al.

No. A-7593. Decided February 24, 1960.
Rehearing Overruled April 6, 1960.
(333 S.W. 2d Series 824)

W. A. Thie, M. E. Clinton, M. W. Reeves, all of Denison, O. O. Touchstone, of Dallas, Dan Moody and Jake Jacobsen, both of Austin, for relator.

Turner, Rodgers, Winn, Scurlock & Terry, James W. Leftwick, George S. Terry and James R. Rodgers, all of Dallas, for respondents.

MR. JUSTICE CULVER delivered the opinion of the Court.

On application of Neuhoff Brothers, a temporary injunction was granted in the 44th Judicial District Court of Dallas County in 1956 restraining the Missouri-Kansas-Texas Railroad Company of Texas, together with its agents, officers, servants and employees from willfully blocking or obstructing Alamo Street in the City of Dallas for more than five minutes at any one time by permitting their trains or car sto stand on and across that intersection. The Court of Civil Appeals affirmed. Missouri-Kansas-Texas Ry. Co. of Texas v. Neuhoff, n.r.e. [156 Texas 690].

On January 26, 1959, Neuhoff Brothers, through its President, filed an affidavit and complaint charging that the Missouri-Kansas-Texas Railroad Company of Texas and certain officers, agents and employees of the Company, namely, W. N. Deramus, the President of the Company and others had willfully violated the injunctive order by permitting and causing the blocking of the Alamo Street crossing on 86 separate occasions for periods varying from six minutes to on one occasion more than an hour, during the period of from January 2 to July 16, 1958, and that the railroad and its officers and agents were, therefore, in con-

tempt of court. Notice was accordingly issued and a hearing was had. The Court found that the crossing had been blocked in excess of five minutes on 86 different occasions during the period as alleged. He adjudged that the relator, Deramus, "acting individually and as an officer of the Missouri-Kansas-Texas Railroad Company of Texas" * * * "did knowingly, willfully and with full knowledge of and in violation of the order and judgment of the 44th Judicial District Court of Dallas County, Texas, permit and cause the Alamo Street crossing in the City of Dallas, Texas, to be blocked by a standing train for a period of time in excess of five minutes." The Court, therefore, held the relator, Deramus, to be in contempt of court for each and every one of the above set forth 80 separate and distinct acts.[1] The Court fixed his punishment at a fine of $50.00 and confinement in the county jail for a period of three days for each and every separate alleged violation, totaling a fine in the sum of $4,000.00 and confinement for 240 days. The relator was further ordered confined until such time as he had fully paid the fine assessed, together with all costs of court. In that judgment the Court also found officials R. B. George, Superintendent of the North Texas District and Eugene Franklin, Superintendent of the Dallas Terminals, guilty as charged on 80 separate violations, and assessed each a fine of $800.00, and a jail sentence of 160 days. Certain operating employees were also held guilty of contempt and punishment was assessed as follows: E. E. Cook guilty of one violation, fined $5.00 and one day in jail; F. V. Davenport guilty of one violation, fined $5.00 and one day in jail; C. B. Huffaker four violations, $20.00 fine and four days in jail; G. W. Morgan two violations, $10.00 fine, two days in jail; R. Peters one violation, $5.00 fine and one day in jail; G. W. Railey one violation, $5.00 fine and one day in jail. Additionally, Missouri-Kansas-Texas Railroad Company of Texas was held in contempt for each and all of the 80 separate violations and assessed a fine of $8,000.00.

The decree provided in conclusion that the fine and imprisonment assessed against each and all "shall be and is hereby suspended for a period of 120 days immediately succeeding the date of this judgment."

In an informal conference with the Judge of the 44th District Court, in Chambers, prior to rendition of judgment, counsel for all parties being present, the judge inquired as to the length of time required to begin the construction of a grade

1.—No explanation is furnished as to why relator was convicted of 80 violations instead of all 86 as the Court said were established and proven.

separation at the Alamo crossing, including the drawing of the plans and other preliminary matters and was told that it would probably take about three months. The judge then stated that he would probably allow 120 days to get the construction under way.

Preliminary to announcement of the judgment the court spoke in part as follows from the bench:

"I have reached a conclusion here which I believe and which I hope will clear up the situation out there that has been a thorn in the side of Neuhoff and the railroad for several years. It occurs to me that it would be in the interest of the railroad and to Neuhoff to cooperate with one another in order that the situation might be remedied. * * * I want to impress upon you this idea - - the convictions here have been suspended for 120 days. This has been done because the court has been assured by the officers of the railroad that within that length of time the construction work which will finally result in an underpass at this place will have begun. This court has no desire to be vindictive about this matter. I am interested in upholding the judgment of the Court, not only by this Court, but of all courts."

. Actual construction on the underpass began within 120 days from the date of the judgment and has been and is being prosecuted with diligence. No further action was taken in this cause until November 19, 1959, when the Judge informed the railroad's attorney that he has set the following November 27th as the date when the relator, Deramus, and all others that had been adjudged in contempt were to be present in court and receive their sentences, both fines and commitments, as a result of the judgment theretofore entered on April 13, 1959. This occurred some 216 days after the entry of that judgment and the suspension that had been granted for 120 days.

Thereafter we granted the motion for leave to file the petition for writ of mandamus in behalf of the relator, Deramus, praying that the Judge of the 44th District Court be ordered and commanded to vacate and expunge said contempt judgment against relator and to dismiss the contempt proceedings.

The relator contends that the writ of mandamus is available to him under the circumstances here and that the alternate remedy of habeas corpus is inadequate. It is inadequate, only, he says, because it would necessitate his arrest and confinement, at least temporarily, until his application for relief could be

presented to this Court, thereby entailing the stigma of this procedure. But that would be true in every case of this nature. Had the District Judge not suspended the judgment of contempt the normal course would have followed, and the remedy adopted by the relator could necessarily have been an application for a writ of habeas corpus.

1 Even so there is considerable logic in relator's contention and ample supporting authority from other jurisdictions.[2] We have uniformly held in this State, however, that the validity of a contempt judgment can be attacked only collaterally and that by way of habeas corpus. Recent decisions to that effect are: Tims v. Tims, 204 S.W. 2d 995, wr. er. ref.; Wagner v. Warnasch, 156 Texas 334, 295 S.W. 2d 890; Ex Parte R. B. Arapis, 157 Texas 627, 306 S.W. 2d 884.

2 We do have authority to correct the action of a trial judge in the abuse of his discretion, or in violation of his clear duty under the law, where there is no adequate remedy by appeal, and even to direct a trial judge to enter an order of dismissal where that is the only proper judgment that can be rendered on undisputed facts. City of Houston v. Adams, 154 Texas 448, 279 S.W. 2d 308; Thomason v. Seale, 122 Texas 160, 53 S.W. 2d 764. Therefore this matter becomes not so much a question of jurisdiction to entertain this application for mandamus, but rather the consideration of a long-established policy. Nevertheless, in view of the unbroken line of authorities we are reluctant to depart from a judicial path so well landmarked, especially so since the claimed inadequacy of habeas corpus in this instance is one common to all cases where escape is sought from the penalties of a contempt judgment. This in itself, we think, is sufficient justification for our refusal of this application. To do otherwise would completely change the procedure long followed in this State and allow in every case an attack on the order of contempt by way of mandamus. Moreover, the presumption obtains that a judge will not attempt to enforce a void order and direct confinement thereunder. He has not yet acted and since the order for these parties to appear was issued by the trial judge some three months after the termination of the period of suspension, and the condition of the suspension, namely, commencement of construction work on the grade separation, has been complied with, it is entirely possible that he contemplates no enforcement of the penalties assessed.

2.—42 Am. Jur., Prohibition, Section 10.5, p. 149; State ex rel Attorney General v. Circuit Court, 97 Wis. 1, 72 N.W. 193; Van Dyke v. Superior Court, 24 Ariz. 509, 211 Pac. 576. To the contrary, People ex rel Livingston v. Wyatt, 186 N.Y. 383, 79 N.E. 330.

We are not to be understood as saying, however, that there may not arise conditions involved in contempt matters where the writ of habeas corpus would not be adequate and where mandamus would be the proper remedy. In fact we recently so ruled in Crane v. Tunks, ante, this volume 182, 328 S.W. 2d 434. We therefore hold that under the facts before us the writ of habeas corpus is not to be held inadequate, and that the writ of mandamus will be denied.

In view of the fact, however, that the case has been fully briefed and argued, and that the entire statement of facts consisting of more than 1,000 pages of evidence adduced on the contempt hearing is here, we deem it not inappropriate, considering the unusual facts of this case, to express our views on the validity of this contempt order in so far as it affects only the relator, Deramus.

**3** The following is all of the testimony relied upon to show a contemptuous violation of the injunctive order. Writ of injunction was granted in 1956; in 1957 relator became President of the Missouri-K. & T. Railway Company of Texas, and of all the branches of that railway system, thereby charging him with knowledge of the injunction. He has been in Dallas at various times, though not shown to have been in the City on the occasions of any blocking of the crossing; that he has discussed generally the railway problems with Mr. George, Division Superintendent, and that Mr. George was evasive in his answers as to the matters discussed; that as President of the railroad the relator had authority and power to correct and prevent the blockings because, so respondent says, this sort of authority and power is inherent in the managerial position occupied by relator; that he admits personal responsibility for railroad traffic across Alamo Street and switching operations at that point for the reason that he has commenced the construction of a grade separation; that he had a discussion with Mr. George in 1957 with reference to means that could be employed to prevent the blocking of the Alamo crossing. If any inference could be drawn from that discussion it would seem to be that the officers of the Company were endeavoring to comply with the order. In no way could it be construed as a willful intention to violate the injunction. Unless it can be said that merely because the relator is President of the entire M. K & T. system, he is personally responsible for the blocking of this crossing for each and every one of the 80 different occasions, then the case against him must fall. Incidentally, it is a fact that on 16 of these 80 occasions the crossing was blocked for only six minutes according to the

witness employed by Neuhoff Brothers to check the railroad operations at this point. The Vice-President and General Manager, who lived in Dallas, and the Superintendent for the entire system, were not cited for contempt. Additionally, there was in the chain of authority the Superintendent of the Northern Division, Mr. George, and the Superintendent of the Dallas Terminal, a Mr. Franklin, as well as various other officials and employees. No attempt was made by Neuhoff Brothers to fix the duties and responsibilities of these officials. It is to be borne in mind that it is one thing to hold the railroad company liable for the acts of agents and employees, but it is quite another to hold the President responsible for the acts of these agents and employees. The President himself is only an employee and his duties and responsibilities are determined by the bylaws and regulations of the company, and subject to control, at least, to some extent by the Directors of the Company. To say that the President of this Company with headquarters in St. Louis, Missouri, has general direction of the affairs of the Company does not imply that he is chargeable personally with all of the details of the operation of the road. It is not shown by any proof that the relator had knowledge of these 80 alleged violations in 1958, much less that he willfully and knowingly violated this order. Only ten violations were found against employees performing the actual train and yard operations. The record shows that there are approximately 300 movements over the Alamo Street crossing in each 24-hour period, or more than 57,000 during the period of these blockings which occurred from January 2, 1958 to July 16, 1958. For the President to have supervised all these movements would have required all of his attention daily at the Alamo crossing. The record shows that the following bulletin was posted for the guidance of those actually in operation of train movements under instructions from the Division Superintendent on January 7, 1957, re-issued and re-posted on January 7, 1958, and again on January 12, 1959:

"January 7, 1957, bulletin No. 7, Alamo Street, must not under any circumstances be blocked longer than five minutes when performing switching over this crossing. Arrangements must be made to either shove back or drag forward over this crossing, whichever is most practicable, every five minutes, regardless of delay to switching, whether automobiles are in sight or not. When doubling trains together over this crossing hose will be used in all cases in order for air test to be made without blocking the crossing."

There is an entire absence of any showing that this bulletin

was not issued in good faith, certainly indicating a lack of intentional and willful violation of the order on the part of the officials of the Company.

Respondent relies on Ex Parte Genecov, 143 Texas 476, 186 S.W. 2d 225, 160 A.L.R. 1099, in urging, apparently, that because the relator is the President of this Company that he is ipso facto guilty of willful violation. Attached to respondent's answer is a certified copy of the judgment of contempt in that case. It was charged that Roosth and Genecov Production Company, a corporation, acting by and through its officers, agents, servants and employees, A. S. Genecov and Sam Roosth, acting individually and as officers and agents of that company, with contempt of the Court in 36 particular violations of the injunctive order. The order restrained the Company and it employees from discharging by seepage or otherwise, salt water or other polluting substances into certain streams. It appears that one of the officers, Sam Roosth, was found not guilty of any of the 36 acts alleged, but that the Company and Genecov were adjudged guilty of violations. What the evidence revealed as to Genecov's participation or responsibility is not shown, but no question was raised as to the want of evidence.

4 Contempt proceedings are generally criminal in their nature whether they grow out of criminal or civil actions. It follows then that the proceedings should conform as nearly as practicable to those in criminal cases. Ex Parte Scott, 133 Texas 1, 123 S.W. 2d 306. Ex Parte Palmateer, 150 Texas 510, 243 S.W. 2d 160.

In a recent decision by the Court of Criminal Appeals in H. W. McCollum v. The State of Texas, 165 Texas Cr. Rep. 241, 305 S.W. 2d 612, the Vice-President of a tank storage depot was convicted in the trial court of polluting public waters in violation of criminal statutes and assessed a fine. On appeal the Court of Criminal Appeals reversed, holding that although the appellant was the head of the company and responsible for its operation and maintenanance by and through delegated subordinates or employees, the conviction could not stand in the absence of testimony showing that he was actually in charge of the operation or in any manner personally connected with the acts complained of or that he knowingly permitted the same to be done. The Court pointed out that the conviction was against the appellant personally, and was not a proceeding against the storage company.

Under that holding the relator, as President not only of the M. K. & T. Railway Company of Texas but of the entire Missouri-Kansas-Texas Railway system with headquarters in St. Louis, only present in Dallas briefly on a few occasions during the time involved here, could not be held criminally liable for the acts and violations of law committed by his subordinates no matter how far removed from him in the chain of authority unless he has encouraged or participated in those violations. 3 Fletcher Cyclopedia, Corporations, Sec. 1348, p. 1126, Permanent Edition. Encouragement or participation on the port of the relator in these violations has not been shown in this case.

5  Contempt is not to be presumed, but on the contrary is presumed not to exist. A judgment of contempt without support in the evidence is void, and the Court is without jurisdiction to order punishment in the absence of some evidence of contemptuous disobedience. Ex Parte White, 154 Texas 126, 274 S.W. 2d 542; Ex Parte Bethurum, 153 Texas 563, 272 S.W. 2d 85; Ex Parte Morris, 147 Texas 140, 215 S.W. 2d 598.

The application for writ of mandamus is denied.

Opinion delivered February 24, 1960.

MR. JUSTICE SMITH, dissenting.

There is no evidence in the record that relator "wilfully" or "persistently," or in any other manner, permitted or caused the Alamo Street crossing to be blocked at any time. The temporary injunction was issued on January 20, 1956. Relator did not become President of the railroad company until June 1957. Since there was no evidence of guilt, the relator should have been acquitted and the contempt proceedings against him dismissed. It is fundamental that a person cannot be guilty of violating any order of which he had no knowledge. See Ex parte Stone, Texas Crimp Rep. 72 S.W. 1000, 1903. Under the circumstances here, as shown by the complete absence of evidence, the only proper order to have entered was one of "not guilty." Such an order would have conformed to the evidence. See Rule 301, Texas Rules of Civil Procedure. The respondent judge was without authority or jurisdiction to render the judgment of contempt which it did render and such judgment is accordingly void. This court has jurisdiction to so hold in this mandamus proceeding. See Ex parte Joy Williams, this volume, 314, 330 S.W. 2d 605, (January 6, 1960); Ex parte Henry, 147

Texas 315, 215 S.W. 2d 588; Ex parte White, 154 Texas 126, 274 S.W. 2d 542; Ex parte Twedell, 158 Texas 214, 309 S.W. 2d 834.

It is true that the above cases are what we commonly denominate as habeas corpus cases, but, in my opinion, the conclusions expressed in each of such cases leads to the further conclusion that where a judge, as in the instant case, has determined to commit and fine a relator on a *void contempt judgment*, this court has the power to issue writs of mandamus and prohibition to prevent the enforcement of a void act. See Yett v. Cook, 115 Texas 175, 268 S.W. 715 (1925), 281 S.W. 843; Article 5, Sec. 3, of the Constitution of Texas. This section of the Constitution provides that the legislature may confer original jurisdiction on the Supreme Court to issue writs of mandamus, etc., in such cases as may be specified, except as against the governor of the state. In Yett v. Cook, supra, this court said:

"The Supreme Court, or any justice thereof, shall have power to issue writs of habeas corpus as may be prescribed by law, and the said court, or any justice thereof, may issue writs of mandamus, procedendo, certiorari and all writs necessary to enforce the jurisdiction of said court, and said court may issue writs of quo warranto or mandamus agreeable in the principles of law regulating such writs against any district judge, or Court of Civil Appeals or judge of the Court of Civil Appeals, or officer of the state government, except the governor of the state."

This court in the case of State v. Ferguson, 1939, 133 Texas 60, 125 S.W. 2d 272, after quoting the above section of the Constitution and a relevant statute, said that mandamus would not lie to correct a merely erroneous or voidable order of a trial judge, but would lie to "correct" one which was void for lack of power to enter. The only way to "correct" the void judgment and to adequately relieve the relator from paying a fine of $4,000 and confinement of 240 days in the county jail, is for this court to perform its constitutional and statutory duty by entering a proper judgment granting the mandamus as prayed for, thereby prohibiting the respondent judge from proceeding further to sentence relator.

I respectfully submit that the course urged by the respondent judge and apparently adopted by the majority view here that the relator go to jail and then seek relief by habeas corpus is not an adequate remedy from a void judgment. No person, whether he be a member of labor, as was Twedell, in Ex parte Twedell, supra, or a president of a railroad company, the relator

here, should be humiliated by incarceration for one minute as required when pursuing relief by writ of habeas corpus. The "long established" policy mentioned by the majority of requiring a person to go to jail has no basis in law, reason, or logic where immediate relief is necessary. Moreover, I respectfully disagree with the statement that the respondent judge possibly contemplates no enforcement of the contempt judgment. The evidence is undisputed that the judge fully intends to commit and fine relator unless prevented by this court. Therefore, it cannot under the circumstances be presumed that the respondent judge will not attempt to enforce his void judgment of contempt.

This court should issue its writ of mandamus compelling the respondent judge to vacate his void judgment of contempt against relator.

Opinion delivered February 24, 1960.

ON MOTION FOR REHEARING

MR. JUSTICE CULVER delivered the opinion of the Court.

Relator has filed a motion for rehearing praying that our original order be set aside and that the original mandamus be granted. In this motion he says that, notwithstanding the view expressed in our opinion that a judge would not attempt to enforce an order which we had indicated to be void, the respondent judge by public utterances had revealed a fixed and determined intention to sentence the relator to jail. He further reiterates his contentions that a writ of habeas corpus issued after he had been placed in jail is inadequate and that his constitutional rights are being impaired.

In the event the Court will not consider its denial of writ of mandamus relator prays that this motion be regarded as an application for a writ of habeas corpus and that this writ be presently granted to free him from implied restraint and threats of arrest.

Relator quotes from a number of newspaper accounts that reveal reported threats on the part of the judge to impose a jail sentence upon the relator at the first opportunity and to institute extradition proceedings to have him arrested in Missouri and brought to Dallas for the purpose of executing the judgment of contempt heretofore assessed. Copies of these newspaper articles are attached to the motion.

**6** In the first place these reports are entirely hearsay and cannot be considered as evidence of what the judge actually intends to do. Even if they were of probative force it is to be said possibly in explanation that the respondent judge may not have understood the full import of our decision. In his reply to the motion for rehearing he says: "It should also be pointed out that Relator's repeated reference to the Order of Contempt as a 'void order' is without support. This is a matter that can and should properly be heard only in the event Relator properly files an Application for Writ of Habeas Corpus." A reading of our original opinion would certainly indicate our view that the contempt order being without support in the evidence was void, but we did not expressly say as much.

In order that there may be no misunderstanding we now hold that as to the relator, Deramus, the contempt order is wholly void and will not support any fine or imprisonment.

We again assert not only the presumption but a very firm belief that no trial judge will attempt to enforce an order that we have held to be void and direct confinement thereunder. If this should occur it would be for the first time in the history of Texas jurisprudence so far as we know.

**7** In the second place we further presume according to the practice followed by the judge heretofore in this case, that the relator is under no danger of arrest, certainly not prior to the service on him of a notice to appear in court and his failure to respect that notice. Admittedly relator would be put to considerable inconvenience in making an appearance, but that is a matter of degree rather than a difference.

We do not perceive that the rlator at the present time is under any character of restraint whatever. He may go and come as freely as he sees fit and for this motion to be treated as an application for a writ of habeas corpus would be premature.

The motion will be overruled.

Opinion delivered April 6, 1960.