**Ex parte Walter J. PINK.**

No. 69759.

Court of Criminal Appeals of Texas, En Banc.

Feb. 10, 1988.

Stanley G. Schneider, Walter J. Pink, Houston, for applicant.

Ted Doebbler, Staff Atty. to the District Judges Trying Criminal Cases, Houston, Robert Huttash, State's Atty., Austin, for State.

## OPINION

ONION, Presiding Judge.

These proceedings involve a habeas corpus application. Applicant was found in contempt of court by the Hon. Albert Pruett, Judge of the 351st District Court on November 4, 1986, for a statement demonstrating disrespect for the court when he stated to a witness on cross-examination, "Isn't it a fact, sir, that in the offense report that you got, that I can't get to...." Punishment was assessed at seven days' confinement in the Harris County jail. In the process of being removed from the courtroom applicant was asked by the court to designate one of the counsel as lead counsel for the defense. Applicant replied, "At this time, Your Honor, I have just fired these two attorneys. They no longer represent this gentleman." Pointing at co-counsel, applicant stated, "You're fired." and "You're fired." The court increased punishment for contempt to ten days' confinement in the county jail. A show cause order was issued, and applicant, an attorney and an officer of the court, was accorded a "determination of guilt or innocence" hearing before another district judge, the Hon. Wallace C. Moore, assigned by the Presiding Judge of the Administrative Judicial Region (nee district) for that purpose. See V.T.C.A., Government Code, § 21.002 (Contempt of Court).

After a hearing Judge Moore entered a judgment of contempt against applicant finding the above quoted statement to be disrespectful and assessed punishment at seven days' confinement in the county jail. Judge Moore declined to make any findings regarding applicant's efforts to fire co-counsel which had also been included in the show cause order. This habeas action followed.[1] Applicant was released on personal bond and Judges Pruett and Moore were requested to respond and to furnish a copy of the transcription of the contempt hearing. Later the matter was ordered filed and submitted by this Court. Applicant, inter alia, contends that the evidence at the hearing before Judge Moore was insufficient to prove that he was in contempt of court.

The record reflects that applicant was retained counsel for Christopher J. Emer-

---

1. In contempt proceedings there is no remedy by appeal. *Ex parte Jacobs,* 664 S.W.2d 360, 361 (Tex.Cr.App.1984) (footnote # 2 and cases there cited); *Ex parte Rose,* 704 S.W.2d 751 (Tex.Cr. App.1984); *Ex parte Eureste,* 725 S.W.2d 214, 216 (Tex.Cr.App.1986).

son, who was charged with sexual assault. It appears undisputed that Charles Freeman and a Mr. Wallace, attorneys, were asked by the applicant to assist him in the jury selection and they continued to assist him during the trial. They do not appear from this record to have been employed by the defendant Emerson.

Considerable tension existed between the prosecutor and defense counsel during the trial and this formed a backdrop to the matter before the court.[2]

On Thursday, October 30, 1986, applicant Pink began to cross examine Officer Vernon Gallier, who had investigated the case, interviewed several witnesses, and made several offense reports. During the cross-examination applicant Pink inquired, inter alia, about the offense report. He asked when a witness Spates had first been aware of the sexual assault. Gallier re-plied he hadn't asked Spates that question. Following an objection the court instructed Pink to move on to another question. The record then reflects:

MR. PINK: No, sir. I need to ask this one.

"THE COURT: I said you may move on to another question. We have covered this one. Do you wish to move on to another question?

"MR. PINK: I will object on denial of cross-examination."

Thereafter the judge retired the jury and found the applicant Pink in contempt of court and assessed his punishment at three days' confinement in jail. Applicant served seven hours with the sheriff giving two days' credit for one day. Applicant was in court the next morning, Friday, but the judge had excused the jury until Monday

2. At the hearing before Judge Moore, Judge Pruett stated the case was a hotly contested trial between the prosecutor and defense lawyers. Applicant Pink testified whenever he made objections mentioning democracy or government the assistant district attorney, Jonathan Munier, would hum the Star Spangled Banner. Attorney Freeman testified at the same time Munier would also appear to be giving the pledge of allegiance. Pink testified that when "black folk" walked into the courtroom dressed in Muslim robes and caps, "like Arabians" that Munier remarked, "Look at those clowns. This must be a circus." Pink considered the remarks to be racist. Applicant Pink also revealed that when his co-counsel, Freeman and Wallace, were examining a checkbook already in evidence that Munier told them, "Put that down. You don't tamper with it." Pink retorted that Munier would be the only person to tamper with the evidence. Pink claimed that at this time Munier gave him the "finger" and when he objected the judge didn't say anything so that he, making the same gesture, told Munier, "Well, then give that to your mother."

Attorney Freeman testified that Munier confronted him with an accusation that he had accosted the complaining witness during a recess making remarks about her being a liar, etc., and stating, "You people just don't know how to act. . . ." Freeman denied the accusation and considered the last remark racist. He admitted that he told Munier, "You are out of your mind, Boy." and repeatedly thereafter referred to Munier as "Boy." Freeman acknowledged that he examined a checkbook in evidence that supposedly had been thrust up the complaining witness' vagina while she was having her period. He wanted to determine if blood appeared thereon. He admitted that the checkbook was in a bent shape and that he had flipped through the pages. While he was doing this he stated Munier snatched the exhibit out of his hands and accused him of tampering with the evidence. It was at this point that Pink confronted Munier, who then made his obscene gesture.

Munier testified that he and Pink argued during the trial and at times he got angry. He acknowledged he made remarks about the people in the gallery, but that he did not call them clowns, that Pink was often playing to the gallery, that at times there was "catcalling" from the gallery, and one black female juror claimed she was being chastised by the gallery. Munier stated defense counsel called him a "white devil," a "godless individual," "a racist" and told him "that God was going to damn me."

Munier related that he confronted Freeman about accosting the complaining witness and that he did make an obscene gesture to Pink. He related that it was Pink, however, who demonstrated the "finger" action to the court. He acknowledged he made soft comments to his co-counsel about Freeman writing cue cards for Pink which he considered humorous. Munier agreed he also made side-bar remarks such as "This is not Perry Mason" which was a common retort of his.

Judge Pruett testified that Munier's nature was consistent with his nature during the trial. "He is very hasty and not an exceptionally patient person during the trial of a case." He did not see Munier's obscene gesture, but stated that Pink was using the gesture in relating to him what happened. The judge related that when these various matters were brought to his attention he admonished both counsel to act professionally and as gentlemen.

thinking applicant would not be released until the weekend.

On Tuesday, November 4, 1986, applicant continued his cross-examination of Officer Gallier concerning his offense report or reports. He repeatedly asked Gallier whether certain statements made by certain witnesses to him were contained in his reports. The applicant constantly asked Gallier to "look at your report" and sometimes directed his attention to certain portions thereof, and sometimes asked for time to review the report himself. Finally the court admonished counsel not to review the report with the witness before or after every question. The witness was told to answer the questions if he knew, but otherwise to state he didn't know the answer. The witness answered the next question, "I just can't recall right now," but the court refused the use of the report. Applicant Pink then prefaced another question, "You're not being allowed to refresh your memory through the police report. Let me ask you this...." There was no objection to the use of such language. When the witness indicated he could not answer a question about the use of gloves by the suspect if he was not permitted to look at his report, the court called a lunch recess and instructed the officer-witness to read his report during such recess. After lunch the cross-examination continued about Officer Gallier's offense reports and reports other officers had prepared, with many objections being interposed. At one point the jury was removed and the court discussed with the applicant his method of cross-examination and his approach to attempted impeachment. Subsequently, in the jury's presence, the applicant asked Gallier to look at his report to see if he had interviewed a Mrs. Fernandez. Thereafter on occasion he asked Gallier to again examine his report to see what Mrs. Fernandez told him. He then asked if Gallier had written in the report something different that Mrs.

Fernandez told him. Gallier denied that and stated he only gave a brief synopsis in the report. Thereafter the record reflects that which became the basis for the contempt.

"MR. MUNIER: I object, Your Honor. Badgering the witness. The witness is attempting to answer.

"THE COURT: Mr. Pink, please refer to 611–A of the Texas Rules of Criminal Evidence,[3] and let's move on.

"MR. PINK: May I approach the witness with the offense report, sir?

"THE COURT: No, sir.

"Q (BY MR. PINK) Isn't it a fact, sir, that in that offense report that you got,[4] that I can't get to—

"MR. MUNIER: Sidebar remark directed at the Court, Your Honor.

"THE COURT: Sustained. Mr. Pink, I think we've had enough of that.

"Ladies and gentlemen, I'm going to ask you to step into the jury room for just a minute, please.

"THE COURT: Mr. Pink, you are once again in contempt of this court. I assess punishment at seven days in jail, and I will allow you a few minutes to confer with the defendant and the two other attorneys to determine which attorney will become lead attorney in the conduct of this defense. We will continue with the trial. You'll have ten minutes for that purpose.

"MR. PINK: At this time, Your Honor, I have just fired these two attorneys. They no longer represent this gentleman. You are fired, and you are fired.

"THE COURT: I'll give you ten minutes to determine the defense of this case.

"MR. MUNIER: I believe Mr. Pink does not have the authority to fire these men.

"THE COURT: That will be ten days in jail."

---

3. It was agreed at the hearing before Judge Moore that there is no such numbered rule and that reference must have been to another rule.

4. The record is not clear. It appears to be undisputed that applicant Pink had the offense report in his hand when he asked to approach the witness and made the statement in question. Whether the witness also had a copy of the report or a different report is not shown by the record.

The contempt order of October 30, 1986, is not before this Court nor was it before Judge Moore. Applicant served the time assessed under that order. Judge Moore declined to make findings as to applicant's attempt to fire other counsel, and that matter likewise is not before this Court. The only contempt matter before this Court then is Judge Moore's finding that applicant's statement "that I can't get to" was disrespectful and in contempt of the trial court.

Judge Pruett testified at the time of the incident in question that applicant Pink had the offense report in his hand, and was approaching the witness when he asked the court's permission to do so; that when permission was denied he continued to walk, but stopped. It was not clear whether applicant had returned to the counsel table before uttering the offending statement. Judge Pruett testified he heard the phrase "that I can't get to" and did not hear anything more once the objection was interposed. He noted that more than one person was talking "and it's difficult for the court reporter to hear and sometimes hard for the Judge to understand what's being said, also." He related that he couldn't read Pink's mind and didn't know how Pink intended to conclude the sentence. Judge Pruett considered the phrase as a side-bar remark "slapping at me for not allowing him to approach the witness with the offense report again" and trying to show the jury "that I was doing something improper." The judge stated that he reached this conclusion without Pink finishing his question. He explained "Just as you would start to run when you saw a— when you had a conclusion that there was a fire in the house you know. Yes. You react to what you conclude."

Judge Pruett agreed that the witness Gallier "more often than I felt he should" asked Pink to repeat his questions. He did not consider the witness was well prepared. "I don't know that he was intentionally evading his answers, but he was not answering the questions very directly." He felt that Pink was going to "extremes" too, and agreed that the cross-examination, "the whole thing was not going very well."

The record also reflects the following on cross-examination of Judge Pruett:

"Q Yes, sir. Are there any general observations that you might have concerning Mr. Pink's manner or demeanor throughout the trial that you would consider as disrespectful or contemptuous?"

"A No. As I've said, there were several minor instances but not of a magnitude that it was worth delaying the trial to do anything about."

The prosecutor, Munier, testified that Gallier "was not the swiftest witness I had ever seen." He did not think Gallier was avoiding answers, but was "kind of slow" and had trouble communicating with the applicant Pink.

Munier, who had his difficulties with the applicant during trial, admitted that he didn't know how Pink was going to finish his sentence at the time of the offending phrase, but he interposed his objection, stating that "I dovetailed in on him [Pink]."

In *Ex parte Jacobs*, 664 S.W.2d 360, 363, 364 (Tex.Cr.App.1984), this Court wrote:

"The court's authority to regulate trials, and accordingly, to punish for contempt, is broad and plenary. *Ex parte Jones*, 331 S.W.2d 202 (Tex.Cr.App.1960). See also 13 Tex.Jur.3rd, Contempt, § 34, p. 226. However, the power to punish for contempt should only be exercised with caution, and contempt is not to be presumed, but on the contrary, is presumed not to exist. *Ex parte Arnold*, 503 S.W.2d 529, 534 (Tex.Cr.App.1974), and cases there cited. See also *Ex parte White*, [154 Tex. 126], 274 S.W.2d 542 (Tex.1955); *Deramus v. Thornton*, 160 Tex. 494, 333 S.W.2d 824 (1960); *Ex parte Rogers*, 633 S.W.2d 666 (Tex.App. —7th Dist.—1982).

\* \* \* \* \* \*

"The fact that counsel pursues a method at variance with that which the court deems correct, with no intended disrespect to the court, should not be subject to a penalty for contempt. See *Ex parte Heidingsfelder*, 206 S.W. 351 (Tex.Cr. App.1918). To establish 'contempt' of

court, it is not the purpose or intent to act which controls, but the act itself must be such as amounts to contempt of court. *Ex parte Bailey,* 142 Tex.Cr.R. 582, 155 S.W.2d 927 (1941); *Ex parte Dowdle,* 165 Tex.Cr.R. 536, 309 S.W.2d 458 (1958).

"The essence of 'contempt' is that the conduct obstructs or tends to obstruct the proper administration of justice. *Ex parte Salfen,* 618 S.W.2d 766 (Tex.Cr. App.1981)." See also *Ex parte Rose,* 704 S.W.2d 751, 757 (Tex.Cr.App.1984).

While the conduct of the applicant as attorney may not have been commendable,[5] and while it might have been irritating or even exasperating to the trial judge, it did not hinder the forward progress of the trial or obstruct or tend to obstruct the administration of justice. We cannot conclude, given all the circumstances, that the phrase "that I can't get to" contained in the unfinished sentence constituted disrespect for the trial court such as to support a judgment of contempt. *Deramus v. Thornton,* supra. See also 13 Tex.Jur.3rd, Contempt, § 57, p. 262.

It should be observed that the original contempt order and the show cause order were based on the actual language used, and did not include any reference to the attitude, demeanor or expression of the applicant Pink when using the language noted. Cf. *Ex parte Sentell,* 153 Tex. 252, 266 S.W.2d 365 (Tex.1954). This is not a case where the attorney was held in contempt for failing to obey an order of the court to take his seat or not to approach the witness stand. Cf. *Ex parte Crenshaw,* 96 Tex.Cr.R. 654, 259 S.W. 587 (1924).

"Trial courts ... must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). "Contempt is strong medicine. Use it cautiously and only as a last resort." *Willson*

*v. Johnston,* 404 S.W.2d 870 (Tex.Civ.App. —Amarillo 1966, no writ).

The relief prayed for is granted. The judgment of contempt is set aside.

WHITE, J., concurs.

---

**5.** In matters of contempt this applicant is no stranger to this Court. See *Ex parte Pink,* 645 S.W.2d 262 (Tex.Cr.App.1982); *Ex parte Pink,*

Writ No. 10,259–92 (Motion for Leave to File Writ of Habeas Corpus denied—Jan. 27, 1988).