Justice WILLETT,
joined by Justice JOHNSON as to Part IV, dissenting.
Intrepidity at the Alamo; entering the United States as the Republic of Texas; fifty-eight Texas-born recipients of the Medal of Honor; Bob Wills and George Strait; Nolan Ryan and Babe Didrikson Zaharias; five Super Bowl titles (sadly none this millennium); Dr Pepper and the “little creamery” in Brenham; deep-fried anything at the State Fair; a spirit of daring and rugged independence — the sources of Lone Star pride are innumerable.
Unfortunately, the juris-imprudent design of the Texas judiciary does not make the list. Today’s case is a byproduct of that recondite web, sparking a game of jurisdictional hot potato between us and our constitutional twin, the Court of Criminal Appeals. Truth be told — and this particular truth has been told repeatedly — the State’s entire Rube Goldberg-designed ju-. dicial “system” is beyond piecemeal repair; it should be scrapped and rebuilt top-to-bottom. That said, and however labyrinthine the jurisdictional maze often is, the answer in today’s case seems straightforward: This dispute belongs with our sister court. It arrived on our doorstep because of a simple yet pivotal misunderstanding: the Court of Criminal Appeals’ mistaken belief that we have unfettered habeas jurisdiction and are thus equally able to grant habeas relief.[1] We do not,[2] and the Court today is unified 9-0 on that point (though the Court does not explicitly mention our sister court’s misinterpretation). We part ways 7-2 on whether we should make lemonade out of jurisdictional lemons by wiring around our habeas limitation and relabeling the relief sought “mandamus.”
The mandamus remedy turns on two findings: legality and practicality.[3] On both scores, I would return this case to the court that conceded two years ago that it “does have the authority to act in this case.”[4] Statute and precedent strongly *379 suggest we cannot hear this case, but even if we can, practical considerations advise we should not. Neither refusing nor resisting, the Court today yanks tighter a Gordian knot that should be cut clean through. I respectfully dissent, and, for good measure, exhort the Legislature to propose a judiciary worthy of Texas.
I. This Case Illustrates (Again) Our Abstruse Judicial “System.”
“An artificial and arbitrary system, as age creeps on, gets hardened arteries.”[5]
The history of Texas courts is indeed a sclerotic one. But all’s well that ends well, and even a helter-skelter judicial structure might be worth the strife if it still managed, despite itself, to produce efficiency. Ours hasn’t.
A. We Have Arrived Here Through Historical Happenstance.
Like many things of Texas lore, the story of our court system begins with its size. During the colonization of Texas, judicial power was vested in the “municipal alcalde, an elected official who held executive, legislative and judicial duties,”[6] and Stephen F. Austin was himself the court of last resort.[7] After winning our independence, “Texas began with a unified judiciary system,”[8] and both the Republic of Texas and the early State had a single high court with both civil and criminal jurisdiction.[9] From statehood through Reconstruction, every appeal from a trial court went directly to the state’s Supreme Court, which at varying times had three or five members.[10]
“Forty years and five constitutions later,” [11] and responding to this Court’s congested docket, the Constitution of 1876 created a three-judge court of appeals for criminal matters and limited this Court’s jurisdiction to civil matters.[12] The court of appeals, which despite its name was not an intermediate court, had final say in criminal appeals, and could also hear civil matters involving less than $1,000.[13] The flow *380 of cases continued unabated, however, and in 1879, the Legislature fashioned another judicial Band-Aid with the creation of a Commission of Appeals.[14] But even doubling the number of commissioners provided scant docket relief, and in 1891 (just fifteen years after the Constitution was adopted), the citizens of Texas tried another approach, a massive overhaul that scrapped the entire Judiciary Article of the Constitution.[15] This kitchen-sink reform abolished the court of appeals and Commission of Appeals, gave criminal jurisdiction to a new Court of Criminal Appeals, and created three new intermediate courts of civil appeals[16] (in Galveston, Forth Worth, and Austin).[17] Our Court would maintain its civil-only docket and focus chiefly on resolving conflicts in the courts of appeals.[18]
The Legislature was also charged with the task of dividing the state into judicial districts, each with its own' court of civil appeals.[19] In 1913, this Court’s jurisdiction grew to include all cases from the courts of civil appeals,[20] and in 1980, a constitutional amendment bestowed criminal jurisdiction on the renamed courts of appeal.[21] Efforts to create a separate body of criminal-only intermediate courts were defeated.[22] So while the two highest courts in the state maintain specialized dockets, the feeder courts beneath them do not.
Generally speaking, under our bifurcated structure, litigants file civil matters in the Supreme Court and criminal matters in the Court of Criminal Appeals. People frequently get misdirected, though — lawyers included — and the courts’ front offices regularly redirect lost litigants to the “other” high court. In fact, this Court’s clerk’s office has a stock letter it sends — every single day — to lost litigants, steering them to our sister court and noting that the Supreme Court “does not have jurisdiction over criminal cases” and “does not review the decisions of the Court of Criminal Appeals.” [23]
Our dual high courts are largely meant to be co-equals — constitutional twins. This is anomalous among court systems, even in the only other two-court state, Oklahoma. Like Texas, Oklahoma has a Supreme Court that hears civil appeals and a Court of Criminal Appeals that *381 hears criminal appeals.[24] But there are two key differences. First, the Oklahoma Court of Criminal Appeals is “subject to the power of the Legislature to change or abolish.”[25] Second, the Oklahoma Supreme Court is truly supreme; if there is a jurisdictional clash, the Supreme Court “shall determine which court has jurisdiction and such determination shall be final.”[26] In other words, there are two states in the nation with two courts of last resort. But only one state — the Lone Star State — has a non-supreme Supreme Court.[27]
B. Our Fragmented Structure is Much Maligned, and Deservedly So.
The convoluted make-up of the Texas judiciary — “one of the most complex in the United States, if not the world”[28] — does not lack for critics, from the litigants who endure it, the lawyers who navigate it, and the judges who lead it. In 1991, this Court’s appointed Citizens’ Commission on the Texas Judicial System reached a stark but unsurprising conclusion: “Texas has no uniform judicial framework to guarantee the just, prompt and efficient disposition of a litigant’s complaint.... With the passage of time, the organization of the courts has become more, not less cumbersome.”[29] That critique mirrors one that same year from the Texas Research League (“TRL”), which former Chief Justice Phillips had asked to scrutinize our judicial structure and suggest concrete improvements. The system’s mind-numbing complexity led TRL to lament in May 1991 that the Texas judiciary was in “disarray” and “ill-equipped to meet the needs of the 21st century,” adding, “Texas does not have a court system in the real sense of the word.”[30] Indeed, “assigning the appellation ‘system’ to our state courts might require a long stretch of the imagination.” [31] Nothing has improved, and interestingly, the most strenuous critics, it *382 seems, are those who know the system best: the judges.
First, trial courts. “Texas has some 3,241 trial courts within its 268,580 square miles.”[32] The complexity at the lower-court level is dizzying, as the attached chart (meant to simplify things) illustrates.[33] In his 2007 State of the Judiciary address, Chief Justioe Jefferson urged the Legislature to modernize our patchwork trial-court system, calling on lawmakers to start “examining whether Texans are best served by the current (and often redundant) complex system of county courts at law, district courts and statutory probate courts, or whether streamlining some of these courts may create a simpler system.”[34] Three members of this Court recently branded our jurisdictional mishmash “unimaginably abstruse,” a tangle that has “gone from elaborate to Byzantine.” [35] A former member of this Court politely called our system “the opposite of a coordinated judiciary.”[36] One former state appellate judge bemoaned our “maze of jurisdiction and procedure” that “[ojnly a puzzle-maker could appreciate.”[37]
In 1993, the Court-appointed Citizens’ Commission on the Texas Judicial System commented that “[n]o one person understands or can hope to understand all the nuances and intricacies of Texas’ thousands of trial courts.”[38] Yet another report bemoaned that “current judicial districts are so fundamentally unfair and so irrationally configured as to shock the conscience of all Texans who familiarize themselves with the present system.”[39] This long-derided irrationality persists.
As one might imagine, our bizarre structure has generated some fanciful factoids — practical problems and offbeat jurisdictional oddities that clog the everyday inner workings of our judiciary. Consider:
• Texas has at least nine different types of trial courts, “although that number does not even hint at the complexities of the constitutional provisions and statutes that delineate jurisdiction of those courts.”[40] Whether a given trial court has jurisdiction is a five-step inquiry.[41]
*383 • As Chief Justioe Jefferson has pointed out: “Some counties share a multi-county district court, while others have multiple districts within the county. And some counties are part of more than one district, creating a shifting target for litigants who may not know which court’s rules prevail. Overlapping geographical jurisdiction creates confusion for litigants and increases the risk of conflicting rulings in a single area.”[42]
• At least one county court has no civil jurisdiction whatsoever.[43]
• Only eight percent of Texas’s justices of the peace are lawyers, even though they can hear cases involving multimillion-dollar claims.[44]
• A civil suit that would be tried before a twelve-person jury in district court would be tried before a six-person jury if filed in a county court.[45]
• District court vacancies are filled by appointment by the Governor[46] but statutory county court vacancies are filled by appointment by the county commissioners, even though those courts frequently have jurisdiction over the same matters.[47]
• Whether there is a minimum monetary limit on the State’s district court jurisdiction actually remains an open question.[48] While the Constitution has been amended to eliminate a monetary minimum, there is some argument that it is still implied[49]
• Generally, jurisdictional limits on statutory county courts range widely by county — from $500 to $100,000[50] — and some such courts have no monetary limits at all.[51]
• “Appellate rights can vary depending on which court a case is filed in, even among trial courts with concurrent jurisdiction, and even when the same judge in the same courtroom presides over two distinct courts.”[52]
Second, intermediate appellate courts. Texas is the only state in the nation in which trial judges answer to more than one intermediate appellate court;[53] that is, *384 no other state has overlapping appellate jurisdictions.[54] Fifteen counties are in overlapping districts.[55] This Court has lamented the “manifest” problems inherent in overlapping districts: “uncertainty from conflicting legal authority,” “the potential for unfair forum shopping,” and “jurisdictional conflicts.”[56] In fact, the two Houston-based courts of appeals have even reached polar-opposite outcomes on the same facts[57] — allowing three passengers in a car accident to sue but not the fourth.[58] The following year, in 2002, we exhorted the Legislature that “[n]o county should be in more than one appellate district.”[59] I suspect we will do so again next year when we issue our required plan to the Legislature on whether any appellate courts should be added, eliminated, consolidated, or reallocated.[60]
The Attorney General’s current chief legal counsel recently bemoaned problems inherent in our overlapping intermediate-court structure: “Much of the problem— and most of the opportunity for reform— lies in the antiquated structure of the lower courts”;[61] likewise, our appellate courts “are struggling to overcome a structure ill-suited to modern caseloads.”[62] Created to ease high-court docket congestion, our “heavily fractured intermediate court structure,” if anything, has created a system “more primed for generating conflicts” than any other state in the nation.[63]
Third, courts of last resort. Coy Reece’s case is but one more cautionary Texas tale. As it illustrates, our dichotom-ized system invites inter-court confusion, and as Texas history shows, inter-court clashes. The Citizens’ Commission report from 1993 noted that conflicts between the dual courts have arisen over the conclusivity of the courts of appeals’ factual determinations, the constitutionality of the “Pool Hall Law,” and whether journals of the House and Senate can be used to contradict an enrolled bill.[64]
In fact, members of the two courts have themselves sometimes highlighted the friction that occasionally befalls a bifurcated system. A Court of Criminal Appeals judge once lamented the split-system’s tendency to shuffle parties needlessly about as he sent an “appellant on his way to begin yet another search for the proper *385 forum.”[65] In another case, three members stated that they were “concerned that this State’s bifurcated judicial process could sometimes generate conflicting decisions at the highest level on identical questions of law.... If there is a problem, it lies with the lines dividing the constitutional jurisdiction of this Court and the Texas Supreme Court.”[66] The Texas system’s decentralized nature has been blamed for a “lack of coordination”[67] that is apparent here. Even the Office of the Attorney General — “the law firm of Texas” itself — is not wholly immune from the jurisdictional confusion. In 1992, the Attorney General’s Office took the rare step of appealing a lower-court ruling striking down the State’s anti-sodomy law to both courts because, as the lead attorney explained, “We want to make sure we’re not locked out of an appeal. It was either file with both or roll the dice.”[68] The Court of Criminal Appeals declined jurisdiction,[69] and this Court eventually ruled that it too had no jurisdiction.[70] The (non)decision was roundly criticized. One might wonder, as did an editorial board, “What’s the point of having not one, but two final state appellate courts if neither of them has the authority to rule on the constitutionality of a Texas criminal statute?”[71] Lawyers ought not be forced to litigate “on a guess and a gamble.”[72]
Up north in Oklahoma, that Supreme Court could decide this jurisdictional quandary swiftly. Not so here, though one court-reform study, mindful of the potential for jurisdictional confusion, proposed a Sooner-like solution whereby “the supreme court should determine which court has jurisdiction, and those determinations should be final.”[73]
C. A Century of Pleas for Structural Reform Have Failed.
The urgency of sweeping judicial reorganization was “a perennial theme”[74] throughout the twentieth century. Earnest reformers like Roscoe Pound[75] and *386 blue-ribbon studies galore urged a sweeping restructuring of our hodgepodge judiciary. Throughout the 1900s, “in virtually every decade of [the] century,”[76] there were regular calls in the Legislature, the academy, and the profession for structural reforms at every level, including high-court merger.[77] There have been periodic small-bore reforms, yet even those piecemeal tweaks were “inexorably tedious and protracted”;[78] ad hoc is the rule — evolutionary rather than revolutionary.
The 1970s were particularly reform-minded. The Judicial Section of the State Bar of Texas pushed for substantial changes to our judicial structure during the 1971 legislative session.[79] That same year, the Legislature proposed a constitutional amendment, eventually adopted by voters in 1972, directing the Legislature to form a Constitutional Revision Commission to “study the need for constitutional change” and then convene in 1974 as a constitutional convention.[80] Also that same year, in October 1971, then-Chief Justice Calvert formed the Chief Justice’s Task Force for Court Improvement to rewrite Article V, the Judiciary Article of the Texas Constitution. In September 1972 the Task Force proposed, among other things, simplifying the trial-court maze, investing the courts of civil appeals with criminal jurisdiction (which happily happened in 1980), reforming judicial selection, and merging our twin high courts.[81] The Calvert Task Force coincided with a court-reorganization report by the House Judiciary Committee, which in 1972 called for extensive changes in the judicial *387 branch.[82]
In early 1973, the thirty-seven members of the Texas Constitutional Revision Commission began nine months of study and public hearings, culminating in a proposed new state constitution.[83] (The Revision Commission was chaired by then-former Chief Justice Calvert, who had left the Court the previous October, one month after his Task Force unveiled its proposed Judiciary Article). Essentially, the Calvert-led Revision Commission adopted the recommendations of the Calvert-led Task Force.[84] Notably, though, the Revision Commission, unlike the Task Force, wrestled with modernizing the entire Texas Constitution, not just Article V. And the document it presented to the Legislature in November 1973 was the first comprehensive effort to draft a new constitution for Texas since the Constitutional Convention of 1875.[85]
The following January, the Legislature convened unicamerally in the House chamber as the Constitutional Convention of 1974. Like the Revision Commission, the Constitutional Convention favored a wholesale overhaul of the entire Constitution, and many of the proposed reforms, especially a right-to-work provision, provoked raucous debate.[86] The Convention dissolved seven months later, falling three votes shy of submitting a new constitution to Texas voters.[87] That October, the House Judiciary Committee submitted a report calling on the Legislature to submit to voters the revision of Article V that the 1974 Constitutional Convention considered.[88]
The Legislature reconvened in January 1975, and this time, acting as a regular legislature and not as a constitutional convention, it approved what became a package of eight separate amendments, including a new Article V, which resurrected the recommendations for a combined high court, courts of appeals with both civil and criminal jurisdiction, and substantial trial-court unification.[89] For the first time in a century, Texans had an opportunity to consider a revised constitution. It was not to be. As in the Constitutional Convention the previous year, fierce opposition arose over various non-judiciary proposals (like annual legislative sessions, a right-to-work provision, and taxation and education reforms) and each and every proposed revision was defeated, including the modernized Article V (which received more votes than any other amendment).[90]
*388 A 1976 interim study of the House Judiciary Committee submitted fifteen piecemeal recommendations,[91] six of which the Legislature enacted (like the creation of the Office of Court Administration).[92] In 1979, then-Chief Justice Greenhill championed in his State of the Judiciary address the rifle-shot reform of giving criminal jurisdiction to the courts of civil appeals,[93] and voters agreed in 1980.[94]
The call for broader reforms persisted throughout the 1990s — from TRL,[95] to the Comptroller,[96] to the Court-appointed Citizens’ Commission.[97] In May 1991, TRL urged a totally new Judicial Article, saying our courts are so “fragmented” that “[t]he Texas court system really is not a system at all.”[98] In 1991, we directed an eighty-four-member Citizens’ Commission on the Texas Judicial System to “study and recommend any necessary or desirable improvements in the courts of Texas.”[99] Given our constitutional responsibility “for the efficient administration of the judicial branch,”[100] the Court invited commonsense reforms, predominantly those related to the “jurisdiction and title of the trial and appellate courts of Texas.”[101] Believing “a sound organizational and administrative structure is essential to a well-regarded judiciary,” the Commission proposed a system that simplified general-jurisdiction trial courts and unified our dual high courts, though the new Supreme Court would have “two divisions, civil and criminal, each with seven justices.”[102]
In the 1990s, the Citizens’ Commission proposals did draw support as part of broader efforts to streamline our ungainly constitution down to something approaching comprehensibility.[103] No such luck; the efforts sputtered. Our unwieldy constitution lives, including our crazy-quilt court system, a top-to-bottom mess. The push for modernization has continued apace in the 2000s. Many observers, including members of this Court,[104] have *389 continued pushing for lower-court simplification, and other voices urge high-court merger as part of a broader restructuring.[105]
Against this bizarre background I turn to Reece’s petition for writ of habeas corpus. It determines the procedural posture that so interestingly animates this case, and channels the kinds of cases this Court can and cannot hear. The issue of jurisdiction — deciding to decide — may sound like a meta-interest floating in the jurisprudential ether, but its importance as a threshold issue cannot be overstated. The matter of to whom the courts are open— and for which claims — colors our bifurcated high-court system, and ultimately disposes of this case. Sections II and III discuss, respectively, the statutory and precedential evidence that suggests we are not permitted by law to hear this case. Section IV explains that even if we do maintain jurisdiction, it would be unwise to exercise it. The former is a matter of a legal directive, the latter a matter of judicial discretion, but both yield the same conclusion: There is no compelling case to hear this case.
II. The Clear Statutory Prohibition that Prevents this Court from Hearing this Case as a Habeas Petition Suggests it Cannot be Cleverly Restyled as Mandamus.
There is no argument that this Court is statutorily hamstrung when it comes to habeas jurisdiction. The Texas Constitution gives us the “power to issue writs of habeas corpus, as may be prescribed by law.” [106] That law is Section 22.002(e) of the Government Code, which limits such jurisdiction to times “when a person is restrained in his liberty by virtue of an order, process, or commitment issued by a court or judge on account of the violation of an order, judgment, or decree previously made, rendered, or entered by the court or judge in a civil case.”[107] Despite the jurisdictional thicket that has sprouted kudzu-like around us, the path out is rather linear.
A. There is No Debate that Habeas May Not Issue Here.
As applies here, this Court has the authority to issue a habeas writ only if Reece both seeks release from custody and appeals from an order of contempt based on a violation of an order, judgment, or decree “previously made” by the court or judge in a civil case.[108] Otherwise, we *390 have no statutory authority to act: If the basis for contempt is not the violation of a previously issued order, we do not have jurisdiction to review a sentence of confinement via habeas corpus.[109] While Reece does seek release from custody, there is no argument — either by the Court,[110] the trial court below, or the very parties before us — that the contempt order here was based on such a violation. Therefore, this Court lacks power to issue habeas relief.
To say this is a rule grounded in statute and in precedent would be an understatement. This Court has been in the business of reviewing habeas petitions based on statutory language similar to Section 22.002(e) for more than 100 years.[111] We have denied jurisdiction over habeas petitions not arising from the violation of a previously made order for just as long.[112] The Court of Criminal Appeals was, respectfully, incorrect when it stated that “[ejffective 1981, Article 5, § 3(a) of the Texas Constitution was amended to give the Texas Supreme Court and the Justices thereof the authority to issue writs of ha-beas corpus.”[113] The amendments of 1980 (effective 1981) did no such thing. Instead, they rewrote the first paragraph of the section, but retained the language that “[t]he Supreme Court and the Justices thereof shall have power to issue writs of habeas corpus, as may be prescribed by law ....”[114] And here, law prescribes that habeas may not issue in this case.
*391 B. There Should Be No Debate that Relabeling the Remedy “Mandamus” Cannot Circumvent this Rule.
The strength of this rule should be heeded as a sign — both from the Texas Legislature and our many decisions construing its enactments — that we are not meant to hear appeals from contempt cases where the basis for contempt is not the violation of a previously issued order, and therefore, we are not meant to ad-lib the means to arrive at the same forbidden end. It is undisputed that we cannot hear this case as a habeas petition. Why, then, should we be permitted to hear it under another name?
This statutory prohibition — the only legislatively mandated anchor in a sea of confused and overlapping jurisdiction — should and does provide a comprehensive sense of this case. By issuing mandamus when we are clearly not permitted to issue habeas, we do a disservice to the framework differentiating the two, as well as to the jurisdictional structure which (for better or worse) we are charged with upholding.
The Court contends “our constitutional and statutory grant of mandamus jurisdiction is broad,” and not limited in the way I suggest here, explaining that “this Court possesses general original jurisdiction to issue writs of mandamus.”[115] But the Court is forced to qualify that proposition by citing to the Texas Constitution: “See Tex. Const, art. V, § 3(a) (granting the Court power to issue writs of mandamus as specified by the Legislature).”[116] The exception nullifies the rule. Our mandamus jurisdiction is undoubtedly circumscribed by law. Where the Legislature has spoken clearly and removed the kind of case now before us from our jurisdiction, it is disingenuous to circumvent the rule by renaming the remedy.
III. Precedent Further Indicates this Court Cannot Issue Mandamus.
The statutory prohibition against habeas is but one reason to dismiss the case. There are others grounded in our mandamus (rather than habeas) jurisprudence. We have at least suggested — if not stated plainly — that the habeas prohibition precludes our ability to hear a ease like this, explaining that “[o]ur original habeas corpus jurisdiction is limited thereby to cases in which a person has been confined for violating an order, judgment or decree in a civil cause, and we are without power to inquire into the legality of restraint imposed for some other reason.”[117]
A. Our Deramus Decision Demonstrates — Rather Than Disproves— that Habeas is Inappropriate Here.
Both Reece and the Court[118] rely heavily upon one sentence in Deramus v. Thornton, in which we preserved the possibility that there might be contempt-related situations where mandamus, not habe-as, would be the proper remedy: “We are *392 not to be understood as saying, however, that there may not arise conditions involved in contempt matters where the writ of habeas corpus would not be adequate and where mandamus would be the proper remedy.”[119] The cautious words of wise jurists intent on protecting a hypothetical situation, however, should not be read to apply to and permit any series of facts that follow.
Deramus was held in contempt for violating an injunction. He sought a writ of mandamus ordering his trial judge to vacate the contempt judgment and dismiss the contempt proceedings. There, as here, we noted that the usual avenue for such a situation was habeas, explaining: “Had the District Judge not suspended the judgment of contempt the normal course would have followed, and the remedy adopted by the relator could necessarily have been an application for a writ of habeas corpus.”[120] Contrary to Reece’s urgings, in Deramus we noted that mandamus was not proper, buttressed in large part by the reasoning that “[w]e have uniformly held in this State ... that the validity of a contempt judgment can be attacked only collaterally and that by way of habeas corpus.”[121] Even when we noted that this question was arguably a matter of policy — a view that seems to pervade the Court’s looser approach to the issue — we still remained “reluctant to depart from a judicial path so well landmarked, especially so since the claimed inadequacy of habeas corpus ... [was] one common to all cases where escape is sought from the penalties of a contempt judgment.”[122] We went on to explain that “[t]his in itself, we think, is sufficient justification for our refusal of this application. To do otherwise would completely change the procedure long followed in this State and allow in every case an attack on the order of contempt by way of mandamus.” [123]
Reece has not violated a previously issued order, meaning this Court may not issue habeas. If the Court in Deramus found that habeas — not mandamus — was appropriate where contempt was the result of the violation of a previously made order, then the Court should find here that neither habeas — nor mandamus — is proper where there is no such violation. The dissent in Deramus acknowledged that ha-beas was the usual remedy in cases where a relator seeks a release from confinement, but maintained the view that the import of the cases suggested a different principle: “[W]here a judge, as in the instant case, has determined to commit and fine a relator on a void contempt judgment, this court has the power to issue writs of mandamus and prohibition to prevent the enforcement of a void act.”[124] It is unclear why the Court has essentially taken up the Deramus dissent without explicitly overruling Deramus.
In sum, what was true in Deramus remains true today: Granting mandamus “would completely change the procedure long followed in this State and allow in every case an attack on the order of con *393 tempt by way of mandamus.”[125] Deramus imagined scenarios in which the inadequacy of habeas would render mandamus the proper route. But Deramus itself demonstrates that this is not such a scenario.
B. In re Long Indicates Mandamus Specifically May Not Issue Here, Where Contempt Sanctions Involve Confinement.
In re Long[126] reinforces this conclusion. There we held mandamus would be proper in the review of contempt sanctions not involving confinement.[127] But because Reece challenges a criminal contempt action involving confinement, not based upon a previously issued order, In re Long is not directly controlling. Therefore, Reece fits into neither category. The Court’s assertion that because we have “declined to read the limitations in our habeas statute as a legislative prohibition against our exercise of mandamus jurisdiction” in fine-only cases, we can rightly “decline to do so here as well”[128] is a non sequitur. Reece was confined, so cases about non-confined persons cannot support the leap made by the Court today. There is simply no precedent establishing that mandamus is the appropriate remedy in this case.
In fact, quite the opposite is true. It can be inferred from In re Long that contempt sanctions that do involve confinement may not be reviewed through mandamus — otherwise, the distinction that case makes would be meaningless. We have applied this kind of logic to the habeas cases discussed earlier, in which we reasoned from the statute permitting issuance of the habeas writ where there is a violation of a previous court order that we were prohibited from issuing the writ where there was no such order. It makes sense to do the same here. Under a simple corollary of the In re Long rule, we are prohibited from issuing mandamus because Reece was subject to contempt sanctions that involved confinement. Even foregoing this inference as the Court would, however, it is clear that mandamus has never been permitted where there was no violation of an order and confinement was involved.
C. The Court Misconstrues the Mandamus Remedy.
The Court’s defense of its decision is based largely on four contentions: (1) mandamus is generally flexible; (2) no law announces that habeas is the exclusive remedy; (3) mandamus has often been used to “gap-fill” where there is no remedy; and (4) our sister court tends to defer to us on matters such as these. The first two stem from a more general view about the mandamus and habeas remedies, respectively. The second two are rooted in case law. I address each in turn.
First, it is true, as the Court points out, that mandamus is available to review rulings in “exceptional cases,” and that “rigid rules ... are necessarily inconsistent with the flexibility that is the remedy’s principal virtue.”[129] But we have regularly deferred to the Legislature’s determinations *394 of when mandamus is appropriate.[130] And the remedy has been largely used in obviously civil cases with no criminal element, and generally has not been used to trump other, independent limitations that work to bar the mandamus remedy.[131] This case is distinguishable on both counts: It presents an underlying civil case with a criminal penalty and is independently limited by precedent that confines the mandamus remedy when it comes to criminal contempt.
Consider, as an illustration, Betts v. Johnson,[132] There, the Court determined that an independent statutory limitation prevented it from issuing mandamus, and consequently overruled a motion to file a mandamus petition.[133] The statutory limitation was an article that permitted the Court to issue mandamus against an “officer of the state government.” [134] But since the writ applied for was against a board of officers, not against an officer, the Court reasoned that it could not issue mandamus.[135] The text of the statute prevented it from doing so. As recently as 2001, some justices of this Court refused mandamus on the same logic — not as a matter of practicality, but instead as a matter of legality.[136]
Similarly, we have determined mandamus may not issue to controvert a prior injunction[137] or to compel an officer to act outside the bounds of the law.[138] In both *395 instances, the existence of law that would conflict with the mandamus remedy functions as an independent limitation upon it. We have also found ourselves powerless to issue mandamus where a collection of statutes suggested we lacked jurisdiction to hear the case in the first place.[139] While this is, to be sure, different from a prohibition specifically against mandamus, it still reinforces the general rule that independent statutory limitations channel the mandamus power.
Second, it is also true that no statutory or constitutional provision states that ha-beas is the only vehicle in this circumstance, and this Court has previously granted mandamus relief in quasi-criminal cases. The first point is a cat’s game, in which neither side wins: While there may not be a provision limiting the possibilities in this case to habeas, there is certainly not one explicitly permitting mandamus. To the contrary, In re Long at least suggests that mandamus is inappropriate where confinement is involved.[140] This and the fact that there is a statutory provision in Section 22.002(e) specifically limiting this Court’s habeas jurisdiction to certain instances — none of which are presented here — are at least two thumbs on the scale for the view that this Court lacks jurisdiction in this instance. As to the second point, having granted mandamus relief in other quasi-criminal cases does not make it appropriate here. Neither party seems to be able to point to a case where this Court granted mandamus on facts such as these, and in the teeth of an independent statute and precedent circumscribing our ability to do so.
Third, according to the Court, many cases support the view that mandamus is a statutory “gap-filler” that may issue here. But in none of these cases did an independent statutory prohibition suggest that mandamus was inappropriate as it does here. Instead, we simply fashioned a remedy because there was a lack of available alternatives. In other words, we are not claiming that express statutory permission is required to issue mandamus; we are simply asking that the Court refrain from issuing mandamus where there seems to be an express statutory prohibition against doing so.
Contrary to the Court’s understanding of my position, I do not believe that “if a statute grants jurisdiction in only a limited circumstance, it must follow that we are forbidden from exercising our mandamus jurisdiction in a situation falling outside the parameters of that limitation.” [141] We have certainly gap-filled properly in the past. This case is distinguishable because there is no gap (the Court of Criminal Appeals can still act, as Reece’s motion for rehearing remains pending there) and because there is statutory evidence not only that our jurisdiction is limited, but also that our jurisdiction is explicitly prohibited in this context.
“Gap-filling” is just that — a decision to act when there is no other avenue open to the parties. Today the Court does something more akin to “needle-threading” than “gap-filling.” It attempts to gap-fill where there is not clearly a gap — where there is, instead, a law.
*396 For this reason, the Court’s citations to various arbitration cases are off-point. In Jack B. Anglin Co. v. Tipps,[142] the Court determined that mandamus was appropriate to review a trial court’s denial of a motion to compel arbitration under the Federal Arbitration Act (“FAA”).[143] But because of an independent statutory limitation — Texas procedural rules — those claiming a right to arbitration under the Texas Arbitration Act (“TAA”) and alternatively the FAA were required to file both an interlocutory appeal under the TAA and a writ of mandamus under the FAA.[144] Was this dual requirement a model of efficiency? Clearly not. But the Court recognized then — as it should realize now — that the form of the remedy was circumscribed by legislative mandate.[145] We reaffirmed that principle in the next case, too.[146]
We gap-filled because without the mandamus remedy the essence of the appeal would vanish, and the arbitration-seeker would be left without the very thing for which he contracted ex ante.[147] But we did not ignore law suggesting or stating we could not do so. Here, there is a wealth of law tending to show the mandamus remedy is not permitted. There is not a gaping hole that suggests oversight, but a narrow cranny that suggests deliberation. In other words, despite the Court’s argument, a “specific allowance for interlocutory appeal under the TAA in the absence of a law allowing for the same under the FAA”[148] is not the same as the presence of an independent statute explicitly suggesting interlocutory appeal is not allowed under the FAA. I doubt we would have permitted mandamus if there had been such a limitation.
This Court has similarly stepped in[149] where the Court of Criminal Appeals could not issue mandamus except as necessary to protect its own judgments.[150] This line of cases only reinforces my own view. We have granted mandamus where the Court of Criminal Appeals was constitutionally prohibited from doing so. We should not short-circuit the Court of Criminal Appeals from issuing habeas where we are statutorily prohibited from doing so.
It is also worth noting that the Legislature eventually intervened to fill in the *397 “gap” for each of these cases.[151] That pattern only demonstrates that if the Legislature determines that the failure to give our Court jurisdiction over cases such as these was mere oversight, it knows well how to correct the error. Unless and until it does so, however, it makes little sense to take the lid off this jurisdictional can of worms, particularly when the can belongs to another.
Fourth and finally, the Court claims that the Court of Criminal Appeals has “preferred to defer” to this Court where contempt proceedings arise from civil cases. In support, it points to a case in which the Court of Criminal Appeals, after doing so, was forced to take the case back after a Supreme Court justice explained that this Court did not have jurisdiction.[152] That example should be followed today. The essence of this question is not in how often the Court of Criminal Appeals may err in attempting to pass a case like this to us, but in how often we have erred in accepting it. That we have never done.
Were we the Oklahoma Supreme Court, sorting out jurisdictional spats like this one by simply taking the case might be a more tenable position. But in Texas, it is the Legislature that designs and divvies up the dockets. And the Legislature has not given us the authority to hear this case— whether we call it habeas or mandamus.
D. The Court’s Reliance on Legislative History is Both Unnecessary and Unwise.
My skepticism of legislative history is well known, and well informed. It is a wariness borne of many years participating in the legislative process at both the state and federal levels, and confirmed by six years on the bench, where I see firsthand the perils of “embarking on a scavenger hunt for extratextual clues prone to contrivance.”[153] Any imagined gains from *398 rummaging around in legislative minutiae, particularly absent any textual ambiguity, are more than dwarfed by multiple realities.
One such reality, unfortunate but also undeniable, is that legislative history is prone to manipulation (by lawyers, judges, and legislators alike) and often cited inaccurately, selectively and misleadingly. More fundamentally, the statute alone is what constitutes the Legislature’s collective will, and isolated snippets along the way lack the authoritative imprimatur of a Legislature that, we must presume, intended precisely what it enacted.
That said, one need not necessarily subscribe to this view to find the Court’s reliance on legislative history unsettling. For this case demonstrates yet another disadvantage to reading through the often-distorting lens of legislative history: It is really no aid at all.
The Court attempts to guess at what the Legislature of 1905 could have meant. The Court’s determination to wrestle with the ghost of Section 22.002(e) reveals, perhaps not surprisingly, that wrestling with ghosts is unsatisfying. After reading the House Judiciary Committee’s report on Senate Bill 36, the Court can only suggest that “perhaps [the Legislature] simply did not envision contempt in civil cases extending beyond [a contemnor’s violation of a court order], and so crafted this Court’s habeas jurisdiction accordingly.”[154] It can only note that the Court of Criminal Appeals has “suggested the same purpose.”[155]
That shaky assumption is the basis for the Court’s assertion that Reece’s case has “fall[en] inside the statutory loophole created by the particular division of habeas jurisdiction between the Court of Criminal Appeals and this Court.”[156] This is a loophole, of course, but only if one looks beyond the text of the statute — and not clearly even then. As another matter, “loopholes” are usually passageways through which unaddressed matters threaten to escape. Here, the text of Section 22.002(e) limits habeas jurisdiction to exceedingly specific instances with the kind of precision that suggests the Legislature was drawing lines, not holes. If it wasn’t, then the Legislature remains free to clarify matters — especially in a case that springs from a judicial maze that lawmakers are best positioned to simplify.
IV. Granting Relief Poses Few Practical Benefits and Many Potential Practical Burdens.
Even if we can issue mandamus here, it is doubly clear that we should not. Even if it is legal, it is certainly impractical. Most peculiar about the Court’s decision to accept this appeal is the lack of any compelling practical reason to do so. The Court of Criminal Appeals itself acknowledged two years ago — before the case even arrived on our doorstep — that it has jurisdiction to hear the case.[157] If we dismiss, *399 Reece will return to our sister court, where a motion for reconsideration remains pending-presumably awaiting our action. This renders untrue the Court’s statement that Reece has “no other procedure to challenge his confinement in our state courts”[158] and “no adequate remedy by appeal.”[159] The Court of Criminal Appeals has not refused to act; it has instead deferred final action until we act first.[160] I agree that “mandamus is a proper vehicle for this Court to correct blatant injustice that otherwise would elude review by the appellate courts,”[161] but that scenario simply does not exist here. As discussed above, the Court has utilized mandamus as a flexible remedy only where all other meaningful roads were blocked. If adequate appellate relief is available elsewhere, mandamus should not be used as judicial duct tape to cover “gaps” that simply do not exist. Where our sister court has conceded its own authority to act, we should be doubly disinclined to intervene.
A. Hearing Reece’s Case Implies a Lack of Equal Sisterhood with Our Supposed Sister Court.
If the instant case offers no reason to seize jurisdiction, the specter of future cases more strongly militates against our doing so. Hearing the case implies that the Supreme Court and the Court of Criminal Appeals are not co-equals. Accepting mandamus jurisdiction when the Court of Criminal Appeals has exclusive habeas jurisdiction over these types of contempt orders would violate the mandated separation with that court. It would evince more respect for an institution we call our equal, and those who created it, to allow it to hear its rightful docket than to encroach pointlessly upon it.
B. Hearing Reece’s Case Will Disorient Deciders, Confusing the Two High Courts and Courts of Appeals Alike.
Similarly, this case leaves open the question of whether and when a petitioner may seek review in both courts, and in what order. Such confusion could lead to an unnecessarily increased docket in either court, or at least wasted resources spent shuffling cases between the two systems (or discussing whether to do the shuffle in the first place). While the Court seems concerned that dismissing Reece’s case would constitute “a potential waste of judicial and litigant resources as the case travels between [both courts], with neither court exercising jurisdiction to consider the merits of Reece’s petition,”[162] that small, one-time shuffle will save us far more than it will cost. Ignoring the reality that our jurisdiction is limited will only make the ping pong match longer, and with more balls in the air.
The confusion caused in hearing this case will affect both litigants and the courts of appeals below that have understood and applied for years the rule that today the Court contravenes. The court *400 of appeals in the instant case certainly believed it was following that rule when it dismissed Reece’s habeas petition for want of jurisdiction. It would be strange to tell those courts that a relator need only style his petition as mandamus to merit jurisdiction, especially when — as the Court acknowledges [163] — those courts have been operating under the assumption that mandamus was the only proper remedy.[164] Even Reece himself assumed this was the rule, as indicated by his decision to file “a motion for reconsideration in the Court of Criminal Appeals, explaining that this Court lacks habeas jurisdiction because the contempt order does not emanate from a violation of an order, judgment, or decree.” [165]
Further, this issue is before us largely because of the Court of Criminal Appeals’ mistaken view that this Court has habeas jurisdiction.[166] Making it a policy to grant cases that arise out of error instead of correcting the error will make neither our court nor our sister court as careful or as diligent in reviewing cases as we ought to be; it will only encourage punting cases— likely, the most difficult cases deserving of the most attention — back and forth between us. Reece claims that these are “unique circumstances” warranting mandamus as a matter of policy; but, contradictorily, Reece also warns that “the next case might involve a party to a civil case sentenced to six months in jail for contempt.” It certainly might. But that would be a matter for the Court of Criminal Appeals.
C. Hearing Reece’s Case May Manufacture Manipulation.
A lack of jurisdictional clarity threatens to encourage forum shopping. An astute attorney may determine that his client stands to receive a more favorable ruling at one court rather than the other, and arrange jurisdiction-manipulative arguments accordingly. After this case, for example, petitioners seeking an audience with the Supreme Court would be advised to style them petitions as mandamus; with the Court of Criminal Appeals, habeas.
D. Hearing Reece’s Case Draws a Blurry, Rather than Bright-Line, Rule.
Finally, the Court’s suggestion that today’s decision draws helpful lines of clarity between the civil and the criminal is unpersuasive. Today the Court may ostensibly limit itself by allowing this Court to grant mandamus in “situations where the underlying dispute is civil in nature, and the Court of Criminal Appeals declines to *401 exercise its habeas jurisdiction.”[167] This has the semblance of a bright-line rule— we hear appeals arising from underlying civil matters, and the Court of Criminal Appeals from underlying criminal matters. But that is misleadingly simplistic, and contravenes prior precedent in which we explained that case categorization does not dispose of this issue.
In other words, it is still true that “[u]n-der the provisions of the Texas Constitution and the pertinent Texas statutes relating to the original jurisdiction of this Court and the Court of Criminal Appeals, the circumstance that the cause out of which a restraint of a person’s liberty arises may be classified as a civil case, is not sufficient to vest this Court with habeas corpus jurisdiction.” [168] Further, hearing this case, and perhaps future cases like it, may force us to handle appeals from civil cases with criminal penalties, and force us at least in part to take on quasi-criminal matters. An unnecessary, duplicative upsurge in this Court’s docket is alarming enough on its own; but one comprised of quasi-criminal cases when there is a separate court designated for criminal matters is even more insupportable.
It is easy to draw a line based upon the nature of the underlying case, but this case alone demonstrates that the line is somewhat meaningless. Even the Court acknowledges that “the distinction between criminal and civil contempt does not turn on whether the underlying litigation is civil or criminal, but rather on the nature of the court’s punishment.”[169] The instant case, then, demonstrates that the cases — like the courts that hear them — are not always cleanly bifurcated. Here, the Court finds constructive criminal contempt even though it was imposed in a civil trial and not for the violation of a court order.[170]
The world is not nearly as tidy as the approach the Court has designed for it. In those blurry instances, it seems best to follow precedent. And a bright-line rule is particularly without its usual benefits where it comes at the expense of precedent that prohibits such a rule. “[W]e are seldom presented with the opportunity to give a jurisdictional statute a reasonable construction that results in more uniformity and simplicity (even if only slightly more), and given that opportunity in this case, I would seize it.”[171] The simplest— and most defensible — approach is not to attempt to create a bright-line rule but to refrain from hearing the case whatsoever. The brightest line is the one drawn between these two courts. After all, the Court of Criminal Appeals has called its original jurisdiction to issue writs of habe-as corpus “unlimited.”[172]
V. Conclusion
No amount of head-tilting and eye-squinting can manufacture jurisdiction where there is none. Where mandamus relief would mirror the effect of a statutorily prohibited habeas writ, we should not hear the case. We should be particularly hesitant where our own mandamus jurisprudence precludes such relief. We should be triply wary where our sister court concedes it “does have the authority to act in this case.”[173]
*402 I understand the Court’s commendable desire to correct an erroneous trial-court ruling, but where our labyrinthine judicial structure curbs our ability to hear certain cases, we must obey that limitation. This is not a case where either — or neither— high court has jurisdiction. This case belongs at the Court of Criminal Appeals, and that court is apparently awaiting our decision before ruling on Reece’s motion for rehearing.
It makes little sense for us to expand, without clear delineations, our own jurisdiction where our sister high court has already declared it has the power to take action. By inventing jurisdiction without practical or legal reasons for doing so, the Court today further muddles the two-court system in which we find ourselves. We may have inherited a jurisdictional house of cards, but it is imprudent to build more intricate towers upon it.
I would dismiss this petition, and in doing so urge my own: The fastest growing state in the nation requires a modernized top-to-bottom judicial structure fit for the twenty-first century and worthy of our great State. At the very least (and it grieves me to use these six words) Texas should be more like Oklahoma, where one high court is truly supreme and empowered to decide jurisdictional squabbles inherent in a bifurcated scheme. I respectfully dissent.
APPENDIX
*403 [[Image here]]

. See In re Reece, No. WR-72,199-02, slip op. at 2 (Tex.Crim.App. June 29, 2009) (per cu-riam) (not designated for publication) ("Although this Court does have the authority to act in this case pursuant to Article 5, § 5, of the Texas Constitution, we decline to do so. Effective 1981, Article 5, § 3(a) of the Texas Constitution was amended to give the Texas Supreme Court and the Justices thereof the authority to issue writs of habeas corpus.”). The Court of Criminal Appeals also offers the civil/criminal distinction as a basis for deference, id., an issue I address below. See infra IV. D. Even so, it is difficult to imagine our sister court lateraling to us had it realized we lack habeas jurisdiction to hear in this case.

. See Tex. Const, art. V, § 3(a) (limiting the habeas jurisdiction of the Texas Supreme Court).

. Though it is discussed explicitly throughout this opinion, tire legality prong has often been implicit: As a general rule, the Legislature determines our jurisdiction. See Tex. Gov't Code § 22.001(a). This principle applies no less strongly to the issuance of mandamus. The practicality prong — namely, that the requesting party must show it has "no adequate remedy by appeal”' — has received more judicial attention. See, e.g., In re Prudential Ins. Co. of America, 148 S.W.3d 124, 135-36 (Tex.2004) (orig. proceeding) ("The operative word, 'adequate', has no comprehensive definition; it is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts.”).

.In re Reece, No. WR-72,199-02, at 2 ("Although this Court does have the authority to act in this case pursuant to Article 5, § 5, of the Texas Constitution, we decline to do so.”).

. Rhodes S. Baker, The Bar Association's Legislative Program — Judicial Control of Procedure, 2 Tex. L.Rev. 422, 429-30 (1924).

. Adrienne Sonder, Tarlton Law Library, Ja-mad Center for Legal Research, Timeline of the Texas Supreme Court and Court of Criminal Appeals (Nov.2006), http://tarlton.law. utexas.edu/justices/timeline.html [hereinafter "Sonder, Timeline ”].

. Texas Research League, Texas Courts: Report One, The Texas Judiciary: A Structural-Functional Overview, at xiii and 2 (1990) (citation omitted) [hereinafter "Texas Research League, Texas Courts: Report I”].

. Joe R. Greenhill, The Constitutional Amendment Giving Criminal Jurisdiction to the Texas Courts of Civil Appeals and Recognizing the Inherent Power of the Texas Supreme Court, 33 Tex. Tech L.Rev. 377, 378 (2002) (citation omitted) [hereinafter "Greenhill, The Constitutional Amendment"].

. Id.

. James T. Worthen, The Organizational & Structural Development of Intermediate Appellate Courts in Texas, 1892-2003, 46 S. Tex. L.Rev. 33, 34 (2004) (citation omitted) [hereinafter "Worthen, The Organizational & Structural Development"]; Leila Clark Wynn, A History of Civil Courts in Texas, 60 Sw. Hist. Q. 1, 4-5 (1956).

. Texas Research League, Texas Courts: Report I, at xiii.

. Id. This was itself "the sixth judicial structure implemented in Texas within 40 years.” H. Comm, on the Judiciary, A Proposal for the Comprehensive Revision of Article V, 63rd Leg., R.S., at 3 (1974) [hereinafter "H. Comm, on the Judiciary, A Proposal”].

. Worthen, The Organizational & Structural Development, at 34 (citation omitted).

. Id. (citation omitted).

. Id. at 34-35 (citation omitted).

. Tex. Const, art. V, § 4-5 (amended 1891).

. Second Court of Appeals, History and Jurisdiction, Texas Courts Online, http://www.2 ndcoa.courts.state.tx.us/court/history.asp (last updated Sept. 2, 2008).

. Tex. Const, art. V § 3 (amended 1891).

. Id. § 6.

. Act of March 26, 1913, 33rd Leg., R.S., ch. 55, § 1, 1913 Tex. Gen. Laws 107. Incidentally, the Commission of Appeals, created in 1879 and eliminated in 1891, was reestablished in 1918 to ease this Court’s still-crowded docket, and in 1925, the Legislature created a two-person Commission of Appeals to help the Court of Criminal Appeals. These two commissioners were folded into the formal Court of Criminal Appeals when its membership grew from three to five in 1966. But just three years later, in 1969, the Commission was reestablished to help the Court of Criminal Appeals meet its workload. See Sonder, Timeline.

. See Worthen, The Organizational & Structural Development, at 39-40 (citations omitted).

. See id. at 40-41 (citations omitted).

. Letter from Blake A. Hawthorne, Clerk of the Supreme Court of Texas (May 9, 2011) (citing Tex. Gov’t Code §§ 22.001-002) (on file in the clerk’s office of the Supreme Court of Texas).

. The Supreme Court of the State of Oklahoma, Bringing a case before the Appellate Courts, http://www.oscn.net./oscn/schome/ appelcase.htm (last visited Mar. 28, 2011). There are 52 state courts of last resort (50 state courts, the criminal courts in Texas and Oklahoma, plus the District of Columbia Court of Appeals). National Center for State Courts, Many states outpace U.S. Supreme Court on gender diversity (Apr. 21, 2010), http://www.ncsc.ori/newsroom/backgrounder/ 2010/gender-diversity.aspx.

. Okla. Const, art. VII, § 1.

. Id. § 4.

. Nearly one hundred years ago, the Alabama Supreme Court explained why this might be a bad idea:
There must be in every state a court capable of exercising ultimate judicial power. In this state that is the Supreme Court. If it were otherwise, there would be no organ of government capable of authoritatively settling judicial questions; and there must be such an organ there can be no doubt, for the judicial department is an independent one, and the element of sovereignty delegated to that department must, as in the case of the executive and legislative, reside, in its last and highest form, in one tribunal, one officer, or body of officers.
Williams v. Louisville & Nashville R.R., 176 Ala. 631, 58 So. 315, 316 (1912).

. George D. Braden et al„ The Constitution of the State of Texas: An Annotated and Comparative Analysis 367 (1977).

. Citizens’ Commission on the Texas Judicial System, Report and Recommendations: Into the Twenty-First Century 3 (1993) [hereinafter Citizens’ Commission, Report and Recommendations].

. Texas Research League, Texas Courts: Report Two, The Texas Judiciary: A Proposal for Structural-Functional Reform, at iii, xi (1991) (emphasis omitted) [hereinafter "Texas Research League, Texas Courts: Report II"].

. Texas Research League, Texas Courts- Report I, at 5.

. In re United Servs. Auto. Ass’n, 307 S.W.3d 299, 302 (Tex.2010) (citations omitted).

. Texas Courts Online, Court Structure of Texas (Mar. 1, 2001), http://www.courts.state. tx.us/.

. Wallace B. Jefferson, The State of the Judiciary in Texas: Presented to the 80th Legislature by Chief Justice Wallace B. Jefferson (Feb. 20, 2007), in 70 Tex. B.J. 314, 316 (2007) [hereinafter "Jefferson, The State of the Judiciary”].

. Sultan v. Mathew, 178 S.W.3d 747, 753 (Tex.2005) (Hecht, J., dissenting) (describing the jurisdictional system in a case regarding jurisdiction over claims originally filed in small claims court).

. Thomas M. Reavley, Court Improvement: The Texas Scene, 4 Tex. Tech L.Rev. 269, 270 (1973) (citations omitted).

. Ed Kinkeade, Appellate Juvenile Justice in Texas: It’s a Crime! Or Should Be, 51 Baylor L.Rev. 17, 59 (1999) (explaining the jurisdictional overlap between Texas’s two courts of last resort as it applies to questions of juvenile appeals).

. Citizens’ Commission, Report and Recommendations 17.

. H. Comm, on the Judiciary, To the Speaker and Members of the Texas House of Representatives, 72nd Legislature, 71st Leg., R.S., at 8 (1990).

. In re United Servs., 307 S.W.3d at 303 (citations omitted).

. Id. at 303-04 ("[R]ecourse must be had first to the Constitution, second to the general statutes establishing jurisdiction for that level of court, third to the specific statute authorizing the establishment of the particular court in question, fourth to statutes creating other courts in the same county (whose jurisdictional provisions may affect the court in question), and fifth to statutes dealing with specif *383 ic subject matters (such as the Family Code, which requires, for example, that judges who are lawyers hear appeals from actions by non-lawyer judges in juvenile cases).” (citation omitted)).

. Jefferson, The State of the Judiciary, at 316.

. See, e.g., Tex. Gov’t Code § 26.321 ("The County Court of Taylor County has the general jurisdiction of a probate court and juvenile jurisdiction as provided by Section 26.042(b) but has no other criminal or civil jurisdiction.”).

. Office of Court Administration, 2010 Annual Report for the Texas Judiciary 13 (2010).

. Jose A. Berlanga and Diana P. Larson, Six is Not Enough: Why Six Person Juries in Concurrent Jurisdiction Cases in County Courts are Not Constitutional, 51 S. Tex. L.Rev. 1, 1 (2009).

. Tex Const, art. V, § 28.

. Tex. Gov’t Code § 25.0009(a).

. See Sultan, 178 S.W.3d at 756 (Hecht, J., dissenting).

. See id. at 756 n. 24.

. Tex. Gov’t Code § 25.0003(c)(1); see also In re United Servs., 307 S.W.3d at 303 (“Statutory county courts (of which county courts at law are one type) usually have jurisdictional limits of $100,000, unless, of course, they do not.") (citations omitted).

. Sultan, 178 S.W.3d at 756 (Hecht, J., dissenting).

. In re United Servs., 307 S.W.3d at 303 (citations omitted).

. See Worthen, The Organizational & Structural Development, at 63-64 ("Texas has the only intermediate appellate system in the nation with overlapping geographical appellate districts.”) (citation omitted).

. See Scott Brister, Is It Time to Reform Our Courts of Appeals?, 40 Hous. Law. 22, 25 (Mar.-Apr.2003) (citations omitted) [hereinafter "Brister, Is It Tirne to Reform? ”].

. Andrew T. Solomon, A Simple Prescription for Texas’s Ailing Court System: Stronger Stare Decisis, 37 St. Mary’s L.J. 417, 451-52 (2006) (citations omitted). In five of these counties, the appellant may choose to file an appeal in either intermediate court. Id. at 451, 453. In the ten Houston-area counties, the intermediate court is randomly assigned. See id. at 451; Tex. Gov't Code § 22.202(h).

. Miles v. Ford Motor Co., 914 S.W.2d 135, 139-40 (Tex. 1995).

. See Montes v. City of Houston, 66 S.W.3d 267, 267-68 (Tex.2001) (Hecht, J., concurring).

. Compare Reyes v. City of Houston, 4 S.W.3d 459, 462 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) with Montes v. City of Houston, 2000 WL 1228618, at *4 n. 3 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).

. Tex. Sup.Ct., Recommendations for Reallocation of Courts of Appeals, Misc. Docket No. 02-9232 (Dec. 17, 2002).

. See Tex. Gov’t Code § 74.022.

. David J. Schenck, Are We Finally Ready to Reshape Texas Appellate Courts for the 21st Century?, 41 Tex Tech L.Rev. 221, 223 (2009).

. Id. at 222.

. Id. at 225-26.

. Citizens’ Commission, Report and Recommendations 11-12.

. Bretz v. State, 508 S.W.2d 97, 98 (Tex. Crim.App.1974) (Roberts, J., concurring).

. State ex rel. Holmes v. Third Court of Appeals, 885 S.W.2d 389, 418-419 (Tex.Crim. App.1994) (Meyers, J., dissenting).

. Keith Carter, The Texas Court of Criminal Appeals, 11 Tex. L.Rev. 455, 470 (1933) ("This lack of coordination extends throughout the courts. To the writer it seems clear that the existence of two independent 'supreme courts’ can not be justified on either theoretical or practical grounds.”).

. Janet Elliott, State Appeals Twice in Sodomy Case, But Neither High Court May Want 'Hot Potato', Tex. Lawyer, May 18, 1992, at 1.

. State v. Morales, 869 S.W.2d 941, 948 n. 16 (Tex. 1994).

. Id. at 947.

. Editorial, Texas' Top Courts Dodge Decision, San Antonio Express-News, Jan. 15, 1994, at 40.

. See Brister, Is It Time to Reform?, at 26. Former Governor Bill Clements, who helped Chief Justice Greenhill promote giving criminal jurisdiction to the courts of appeals, once speculated that a majority of Texans "have no idea that we have a parallel system of courts, and the Supreme Court is, in fact, not supreme .... We can have a better court system, if we start right at the top and combine these two courts into one court.” See G. Robert Hillman, Clements Wants One Texas Supreme Court, Dallas Morning News, Mar. 18, 1987, at 1A.

. Texas Research League, Texas Courts: Report II, at 25.

. Clarence A. Guittard, Court Reform, Texas Style, 21 SW. L.J. 451, 451 (1967) [hereinafter "Guittard, Court Reform "].

. Dr. Roscoe Pound, Address Before the Thirty-Seventh Annual Proceedings of the Texas Bar Association, 37 Tex. Bar Ass'n 205-16 (1918) (J.A. Lord, rep.) [hereinafter "Lord, Tex. Bar. Ass’n”].

. Texas Research League, Texas Courts: Report I, at xvii.

. The Texas Bar Association saw an urgent need for judicial reorganization and responded by recommending an ambitious Article V overhaul. See Lord, Tex. Bar. Ass’n 69. Over the years, numerous distinguished lawyers and jurists pushed continually for system-wide reforms. See Guittard, Court Reform, at 453 (citing several calls for reform). In 1933, the Texas Civil Judicial Council, a longtime proponent of broadbased judicial reform, advocated a single, nine-member Supreme Court to handle both civil and criminal matters. Texas Judicial Council 1929-1997, at 63 (Aug. 31, 1997), reprinted from Texas Judicial Council 50th Annual Report 60, 63 (1978). In 1941, then-Chief Justice Alexander exhorted the Council that "[w]e need a reorganization of our judicial system,” prompting the Council to propose a wholesale revision of Article V, which later died in a House subcommittee. Guittard, Court Reform, at 453-54 (citation omitted). In 1943, then-Dean of the University of Texas Law School, Charles McCormick, echoed the call for reform, including a single high court. Charles T. McCormick, Modernizing the Texas Judicial System, 21 Tex. L.Rev. 673, 695 (1943). A decade later, in the early 1950s, State Bar President Cecil Burney led another ill-fated effort to rewrite Article V, including judicial selection and high-court consolidation, proposals favored by a first referendum of state bar members but rejected by a second referendum. Guittard, Court Reform, at 454. In 1964, a conference sponsored by the state bar and the Joint Committee for the Effective Administration of Justice, derided our "unorganized and fragmented courts,” calling it "archaic” and calling for "a single and unified court system." Lawyers, Laymen Urge Modernization of Texas’ Antiquated Judicial System, 27 Tex. B.J. 299, 305 (1964).

. Texas Research League, Texas Courts: Report I, at 66.

. See Tex. H.B. Nos. 1372-1376, 62nd Leg., R.S. (1971); Tex. H.R.J. Res. Nos. 77-80, 62nd Leg., R.S. (1971).

. Tex. H.R.J. Res. 61, 62nd Leg., R.S., 1971 Tex. Gen. Laws 4140.

. Task Force for Court Improvement, Proposed Judiciary Article of the Texas Constitution (1972) [hereinafter "Task Force. Proposed Judiciary Article”]. See also Greenhill, The Constitutional Amendment, at 379-80 (citations omitted).

. H. Comm, on the Judiciary, Streamlining the Texas Judiciary: Continuity with Change, 62nd Leg., R.S. (1972). This report prompted consideration in the 63rd Legislature, Regular Session of 1973 of Tex. H.B. Nos. 725, 1401-07, and 1600; Tex. H.R. Res. Nos. 48 and 96; and Tex. H.R. Con. Res. 129. See H. Comm, on the Judiciary, A Proposal, at 3 n.5.

. Greenhill, The Constitutional Amendment, at 383 (citation omitted). Chief Justice Calvert had also once served as Speaker of the' Texas House of Representatives.

. Compare The Texas Constitutional Revision Commission- A New Constitution for Texas 109-22, with Task Force: Proposed Judiciary Article 1-5.

. Texas State Historical Association, Constitutional Convention of 1974, Handbook of Texas Online, http://www.tshaonline.org/ handbook/online/articles/mjc07 (last visited May 25, 2011).

. Id.

. Id.

. See generally H. Comm, on the Judiciary, A Proposal.

. Greenhill, The Constitutional Amendment, at 384 (citations omitted).

. Id. at 384-85.

. H. Comm, on the Judiciary, The Texas Court System: Manpower, Resources, and Management, 65th Leg., R.S., at 2-5 (1976).

. Citizens' Commission, Report and Recommendations 4 n.9.

. Joe R. Greenhill, State of the Judiciary: Address By the Texas Supreme Court Chief Justice to the 66th Texas Legislature (Jan. 31, 1979), in 42 Tex. B.J. 379, 380 (1979).

. Greenhill, The Constitutional Amendment, at 396.

. Texas Research League, Texas Courts: Report I, at xvii.

. Citizens' Commission, Report and Recommendations 3 n.4.

. Id. at 9-12.

. Texas Research League, Texas Courts: Report II, at 1. TRL’s earlier report in 1990 reached a similar conclusion: "Because the courts are so decentralized and because individually they are quite independent, it is difficult to call the Texas judiciary a system.” Texas Research League, Texas Courts- Report I, at xvii.

. Citizens' Commission, Report and Recommendations 47.

. Tex. Const, art. V, § 31.

. Citizens’ Commission, Report and Recommendations 5.

. Id. at 1. This two-courts-in-one proposal resembles one first proposed by Charles De Morse, a delegate at the Texas Constitutional Convention of 1875. Debates in the Texas Constitutional Convention of 1875, at 384-85 (Seth Shepard McKay ed., 1930).

. Editorial, Texas Constitution: State should overhaul this outmoded relic, Dallas Morning News, Nov. 12, 1995, at 2J.

. See Sultan, 178 S.W.3d at 753 (Hecht, J., dissenting); Jefferson, The State of the Judiciary, at 316.

. Editorial, Improve Texas justice by combining courts, Austin American-Statesman, Feb. 18, 2003, at A10.

. Tex. Const, art. V, § 3(a).

. Tex Gov’t Code § 22.002(e).

. See Ex parte Morris, 162 Tex. 530, 349 S.W.2d 99, 101 (1961) (orig. proceeding) ("[T]he statute limits our power in the language just stated, and we may inquire only into restraint brought about by an order or process of the court issued because of the violation of some order, judgment or decree in a civil case.”) (citation omitted): see also Ex parte Jackson, 113 Tex. 58, 252 S.W. 149, 149-50 (1923) (orig. proceeding) (''It is apparent that Judge Duncan [in his role as an attorney in another case] was held in contempt by the trial court, not for violating any order made by the court in a civil case, but because of certain language used in a brief filed in the case. From this statement it appears that, although the alleged contempt arose out of a civil case, yet, since it did not arise by reason of a violation of the court's order, the Supreme Court declined to take jurisdiction. The Court of Criminal Appeals, as shown by the report of the case, did take jurisdiction, and discharged the relator.”). Ex parte Jackson was decided under a precursor to Section 22.002(e) — article 1529 — which limited habeas jurisdiction to times when "any person is restrained in his liberty by virtue of any order, process or commitment, issued by any court or judge, on account of the violation of any order, judgment or decree theretofore made, rendered or entered by *390 such court or judge in any civil cause.” 252 S.W. at 149. Ex parte Moms was decided under article 1737, a precursor to Section 22.002(e) with the same wording as article 1529. 349 S.W.2d at 100; Act of Oct. 7, 1895, 24th Leg., R.S., ch. 53, § 1, 1895 Tex. Gen. Laws 79 (amended 1905, 1909, 1927, 1933, 1941, 1943, 1963, 1981, 1983), repealed by Act of June 12, 1985, 69th Leg., R.S., ch. 480, § 26(1), 1985 Tex. Gen. Laws 1720, 2050.

. See Ex parte Morris, 349 S.W.2d at 101.

. The Court cites to a case in which this Court, without discussing the statutory limits of our habeas jurisdiction, upheld a contempt judgment against an attorney. 341 S.W.3d 360, 372 (Tex.2011); (citing Ex parte Fisher, 146 Tex. 328, 206 S.W.2d 1000 (1947) (per curiam) (orig. proceeding)). It also cites to a case in which this Court found it possessed jurisdiction without discussing whether the contemnor's acts involved the violation of a court order. 341 S.W.3d at 372-73 (citing Ex parte Calhoun, 127 Tex. 54, 91 S.W.2d 1047, 1048-49 (1936) (orig. proceeding)). But Ex parte Fisher did note that "[i]n a habeas corpus proceeding of this character this court has only limited powers.” 206 S.W.2d at 1003. And tire Court in Ex parte Calhoun did not need to address whether a violation of a court order was involved since — as the Court notes — it did not find that there was restraint. 91 S.W.2d at 1048.

. See, e.g., Ex parte Allison, 99 Tex. 455, 90 S.W. 870, 872 (1906) (denying a habeas writ resulting from contempt for violation of an injunction); Ex parte Gonzalez, 111 Tex. 399, 238 S.W. 635, 636 (1922) (orig. proceeding) (granting habeas relief where contempt judgment was void because trial court lacked jurisdiction to find contemnor in contempt).

. See, e.g., Ex parte Reid, 99 Tex. 405, 89 S.W. 956, 956 (1905) (explaining the Supreme Court had no jurisdiction over a habeas petition where "[the] only contention is that the imprisonment is illegal”); Ex parte Jackson, 252 S.W. at 149 ("[W]e may inquire only into the restraint brought about by an order or process of the court issued because of the violation of some order, judgment, or decree in a civil case.”).

. In re Reece, No. WR-72,199-02, at 2.

. See Tex. S.J. Res. 36, 66th Leg., R.S., 1979 Tex. Gen. Laws 3223. The 1980 amendments were adopted at the Nov. 4, 1980 election, and became effective Sept. 1, 1981. See Tex. Const, art. V, § 3.

. 341 S.W.3d at 373.

. 341 S.W.3d at 374 (emphasis added). The Court subsequently cites to Tex. Gov’t Code § 22.002(a) (permitting the Court to issue writs of mandamus “agreeable to the principles of law regulating those writs”). This Court should not issue mandamus where, as here, it is dis agreeable to principles of law — those clearly stated in our statutory prohibition against hearing this case styled as habeas.

. Ex parte Morris, 349 S.W.2d at 101 (emphasis added).

. See 341 S.W.3d at 370 (”[W]e have also left open the possibility of circumstances 'where the writ of habeas corpus would not be adequate and where mandamus would be the proper remedy.’ ”) (quoting Deramus v. Thornton, 160 Tex. 494, 333 S.W.2d 824, 827 (1960) (orig. proceeding)).

. Deramus, 333 S.W.2d at 827.

. Id.

. The opinion then goes on to note several then-recent decisions to that effect. Id. (citing Tims v. Tims, 204 S.W.2d 995 (Tex.Civ. App.-Amarillo 1947, writ ref'd); Wagner v. Warnasch, 156 Tex. 334, 295 S.W.2d 890 (1956); Ex parte Arapis, 157 Tex. 627, 306 S.W.2d 884 (1957)).

. Deramus, 333 S.W.2d at 827.

. Id.

. Id. at 830 (Smith, J., dissenting) (citations omitted) (emphasis omitted).

. Deramus, 333 S.W.2d at 827.

. 984 S.W.2d 623 (Tex. 1999) (per curiam) (orig. proceeding).

. See In re Long, 984 S.W.2d at 625 ("Contempt orders that do not involve confinement cannot be reviewed by writ of habeas corpus, and the only possible relief is a writ of mandamus.”) (citing Rosser v. Squier, 902 S.W.2d 962, 962 (Tex. 1995) (per curiam) (orig. proceeding)).

. 341 S.W.3d at 377.

. 341 S.W.3d at 374 (quoting In re Prudential, 148 S.W.3d at 136) (quotation marks omitted).

. See, e.g., In re Watkins, 279 S.W.3d 633, 634 (Tex.2009) (Noting as dispositive whether "granting mandamus to review ... would subvert the Legislature’s limit on such review."); Teat v. McGaughey, 85 Tex. 478, 22 S.W. 302, 303 (1893) ("The bill of right secures the right of trial by jury, and, while the people doubtless could amend the constitution so as to modify or limit the right, we do not think any modification was intended by the provision in the late amendments which authorized the legislature to confer jurisdiction upon this court to issue the writ of mandamus in certain specified cases.”).

. See, e.g., In re AIU Ins. Co., 148 S.W.3d 109, 110 (Tex.2004) (granting mandamus in the arbitration context); In re CSX Corp., 124 S.W.3d 149, 151 (Tex.2003) (per curiam) (granting mandamus in the discovery context); In re Ford Motor Co., 165 S.W.3d 315, 322 (Tex.2005) (per curiam) (granting mandamus in the legislative-continuance context).

. 96 Tex. 360, 73 S.W. 4(1903).

. Id. at 5.

. Act of Apr. 13, 1892, 22nd Leg., C.S., ch. 14, § 1, art. 1012, 1892 Tex. Gen. Laws 19, 21, repealed by Act of May 12, 1939, 46th Leg., R.S., ch. 25, § 1, 1939 Tex. Gen. Laws 201.

. Betts, 73 S.W. at 5 ("But the writ applied for in this case is against a board of officers, and not against an officer. It seems that, if it had been the purpose to empower this court to issue the writ as well against a board of officers as against a single officer, the language would have been, ‘any officer or board of officers of the state government.' ”).

. See In re TXU Elec. Co., 67 S.W.3d 130, 136 (Tex.2001) (per curiam) (Baker, J., concurring) ("Because I believe this Court does not have jurisdiction to mandamus a state board or commission, I can only concur in the Court’s judgment that TXU is not entitled to mandamus relief.”).

. "The rule is, of course, an elementary one that mandamus will not lie to an inferior court where proceedings therein have been enjoined.” Sterling v. Ferguson, 122 Tex. 122, 53 S.W.2d 753, 757 (1932) (quotation marks and citations omitted); 2 Thomas Carl Spelling, Extraordinary Relief § 1402, at 1159 (1893) ("It is a familiar principle that mandamus does not lie to compel a party to violate an injunction; and the principle is as applicable where the writ is sought in a superior court as in other cases.”).

. "[Mjandamus cannot issue to compel a public officer to do an act which is not clearly prescribed by law.” Horton v. Pace, 9 Tex. 81, 84 (Tex. 1852) (citations omitted) (emphasis omitted).

. See Kidder v. Hall, 113 Tex. 49, 251 S.W. 497, 498 (1923) (citing to various statutes and concluding that mandamus could not issue in part because "[fjrom a consideration of all the articles named,” jurisdiction fell within the district court, and therefore this Court had no jurisdiction).

. See 984 S.W.2d at 625.

. 341 S.W.3d at 376.

. 842 S.W.2d 266 (Tex. 1992) (orig. proceeding).

. Id. at 273.

. Id. at 272.

. Id. (“Although we can conceive of no benefit from such an unnecessarily expensive and cumbersome rule, we may not enlarge appellate jurisdiction absent legislative mandate.”).

. In re D. Wilson Constr. Co., 196 S.W.3d 774, 780 n. 4 (Tex.2006) ("While we continue to see no benefit in requiring parties to pursue parallel proceedings that are 'unnecessarily expensive and cumbersome,' we remain mindful that ‘we may not enlarge appellate jurisdiction absent legislative mandate.' ”) (quoting Jack B. Anglin Co., 842 S.W.2d at 272).

. Jack B. Anglin Co., 842 S.W.2d at 272.

. 341 S.W.3d at 376.

. See, e.g., Fariss v. Tipps, 463 S.W.2d 176, 180 (Tex.1971) (orig. proceeding); Lawrence v. State, 412 S.W.2d 40, 40 (Tex.1967) (per curiam) (orig. proceeding); Wilson v. Bowman, 381 S.W.2d 320, 321 (Tex.1964) (orig. proceeding); Cooper v. State, 400 S.W.2d 890, 890-92 (Tex. 1966) (orig. proceeding). While it is true, as the Court points out, that the Court “occasionally entertained” these petitions, 341 S.W.3d at 376, it ultimately issued mandamus in only one of these four cases. See Fariss, 463 S.W.2d at 177.

. See Tex. Const. art. V, § 5 (amended 1977 and 1980); Thomas v. Stevenson, 561 S.W.2d 845, 847 (Tex.Crim.App.1978) (en banc).

. See Tex. Civ. Prac. & Rem.Code § 51.016 (enacting a law authorizing interlocutory appeals under the FAA in Texas courts); Tex. S.J. Res. 18, 65th Leg., R.S., 1977 Tex. Gen. Laws 3359 (amending the Constitution to provide the Court of Criminal Appeals with mandamus jurisdiction over all criminal law matters).

. 341 S.W.3d at 373 (citing Ex parte Duncan, 78 Tex.Crim. 447, 182 S.W. 313, 313 (1916)). It also cites to a case in which the Court of Criminal Appeals simply noted that it will not act until we determine whether we have habeas jurisdiction. Id. (citing Ex parte Cvengros, 384 S.W.2d 881, 882 (Tex.Crim. App. 1965)). That seems to be what has happened here, and we should rule that we do not have jurisdiction.

. Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 475 (Tex.2009) (Willett, J., concurring) (footnote omitted). See also, e.g., Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 652 n. 4 (Tex.2006) ("[W]e are mindful that over-reliance on secondary materials should be avoided, particularly where a statute’s language is clear. If the text is unambiguous, we must take the Legislature at its word and not rummage around in legislative minutiae."); Summers, 282 S.W.3d at 475 (Willett, J., concurring) ("Laws exist to guide behavior, and by resting on statutory language rather than embarking on a scavenger hunt for extratextual clues prone to contrivance, we ensure that everyday Texans struggling to decode the law and manage their affairs consistent with it can rely on a statute 'to mean what it says,’ without having to hire lawyers to scour the legislative record for unexpressed (and often contradictory) in-dicia of intent.”) (footnotes and citations omitted); AIC Mgmt. v. Crews, 246 S.W.3d 640, 650 (Tex.2008) (Willett, J., concurring) ("The statute itself is what constitutes the law; it alone represents the Legislature's singular will, and it is perilous to equate an isolated remark or opinion with an authoritative, watertight index of the collective wishes of 181 individual legislators, who may have 181 different motives and reasons for voting the way they do.”) (footnote omitted); Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund, 212 S.W.3d 320, 330 n. 1 (Tex.2006) (Willett, J., concurring in part and dissenting in part) (“These dueling snippets of legislative *398 history illustrate the peril of placing undue reliance on secondary materials. Anyone looking for a preferred interpretation can usually find a ready ally lurking in the legislative record, even if the statute’s literal text points the opposite direction. I do not reject out of hand the principled use of legislative history to unearth reliable guidance (unless the text’s plain language is unequivocal), but it certainly merits a jurisprudential grain of salt. The enacted, voted-on text is what constitutes the law.”) (citation omitted).

. 341 S.W.3d at 372 (emphasis added).

. 341 S.W.3d at 372 (emphasis added).

. 341 S.W.3d at 373.

. In re Reece, No. WR-72,199-02, at 2 ("Although this Court does have the authority to act in this case pursuant to Article 5, § 5, of the Texas Constitution, we decline to do so.”).

. 341 S.W.3d at 374.

. 341 S.W.3d at 369.

. That the strange Texas jurisdictional system offers Reece a remedy via the Court of Criminal Appeals easily disposes of his reliance on a United States Supreme Court case for the notion that this scenario is “of such a character as to be an exception to the rule of procedure that other available sources of judicial power may not be passed by for the purpose of obtaining relief by resort to the original jurisdiction of this court.” Ex parte Hudgings, 249 U.S. 378, 379, 39 S.Ct. 337, 63 L.Ed. 656 (1919).

. 341 S.W.3d at 374.

. 341 S.W.3d at 374.

. See id. at 370 ("[SJeveral courts of appeals have presumed mandamus is limited to the review of fine-only contempt orders, but not orders that result in confinement.”) (citations omitted),

. See, e.g., In re M.J., 227 S.W.3d 786, 793 (Tex.App.-Dallas 2006, pet. denied [mand. denied] ) ("Contempt orders involving confinement must be challenged by writ of habeas corpus.”); Cadle Co. v. Lobingier, 50 S.W.3d 662, 671 (Tex.App.-Fort Worth 2001, pet. denied) (en banc) ("A contempt judgment is reviewable only via a petition for writ of habe-as corpus (if the contemnor is confined) or a petition for writ of mandamus (if no confinement is involved).”); In re Zenergy, Inc., 968 S.W.2d 1, 12 (Tex.App.-Coipus Christi 1997, orig. proceeding) (reasoning that because the contempt judgment in the case involved confinement, mandamus relief was improper, and any relief "will come through habeas corpus review.”).

. 341 S.W.3d at 364 (citation omitted).

. In re Reece, No. WR-72,199-02, at 2 (“Effective 1981, Article 5, § 3(a), of the Texas Constitution was amended to give the Texas Supreme Court and the Justices thereof the authority to issue writs of habeas corpus.”). The Court does not acknowledge this mistake.

. 341 S.W.3d at 376.

. Ex parte Hofmayer, 420 S.W.2d 137, 138 (Tex. 1967) (orig. proceeding).

. 341 S.W.3d at 365 (citation omitted).

. 341 S.W.3d at 365 (citations omitted).

. Sultan, 178 S.W.3d at 753 (Hecht, J., dissenting).

. State v. Briggs, 171 Tex.Crim. 479, 351 S.W.2d 892, 894(1961).

. In re Reece, No. WR-72,199-02, at 2 ("Although this Court does have the authority to act in this case pursuant to Article 5, § 5, of the Texas Constitution, we decline to do so.").